**ABB INDUSTRIAL SYSTEMS, INC., Plaintiff–Appellant,**

v.

**PRIME TECHNOLOGY, INC., General Resistance, Inc., Zero–Max, Inc., Barry Wright Corporation, Pacific Scientific Company, Defendants–Appellees.**

No. 970, Docket 96–7869.

United States Court of Appeals, Second Circuit.

Argued April 30, 1997.

Decided July 25, 1997.

Kevin J. Lyons, Milwaukee, WI (Pamela H. Schaefer, Cook & Franke, Milwaukee, WI, Benjamin Green, Joseph M. Pastore, III, Kelley Drye & Warren, Stamford, CT, of counsel), for Appellant.

Norman A. Dupont, Los Angeles, CA (Cindy F. Forman, Shapiro, Hinds & Mitchell, Los Angeles, CA, Charles T. Lee, Harold N. Eddy, Jr., Alejandro J. Diaz, Paul, Hastings, Janofsky & Walker, Stamford, CT, of counsel), for Appellee Pacific Scientific Company.

Allan B. Winston, Rye, NY (Joseph Winston, A. Joyce Furfero, Rye, NY, of counsel), for Appellees General Resistance, Inc. and Prime Technology, Inc.

William H. Harbeck, Milwaukee, WI (Quarles & Brady, Milwaukee, WI, of counsel), for Appellee Barry Wright Corporation.

Rick E. Kubler, Tami L. Norgard, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, MN, for Appellee Zero–Max, Inc.

Before: MESKILL and NEWMAN, Circuit Judges, and KEENAN, District Judge.*

MESKILL, Circuit Judge:

After discovering that a piece of real property that it owned was contaminated by hazardous chemicals, plaintiff sued several companies that had previously controlled the property, alleging (1) violations of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), (2) violations of the Resource Conservation and Recovery Act (RCRA), (3) common law negligence, and (4) breach of contract against the defendant that sold the property to plaintiff. The United States District Court for the District of Connecticut, Dorsey, *C.J.*, granted summary judgment to several of the defendants. The district court then certified that its decision as to those defendants was imme-

---

* Honorable John F. Keenan, United States District Judge for the Southern District of New York, sitting by designation.

diately appealable pursuant to Fed.R.Civ.P. 54(b), and plaintiff appealed.

We conclude (1) that the district court properly dismissed plaintiff's CERCLA claims against those defendants, as there is no genuine issue of triable fact as to whether the dismissed defendants spilled chemicals or otherwise contaminated the property; moreover, although hazardous chemicals may have gradually spread underground while the dismissed defendants controlled the property (passive migration), we conclude that prior owners are not liable under CERCLA for passive migration; (2) that plaintiff's RCRA claims against those defendants were properly dismissed because plaintiff cannot establish either that the defendants are presently in violation of an environmental law or that the defendants contributed to an imminent environmental danger; (3) that plaintiff's negligence claims were properly dismissed because plaintiff cannot establish that the defendants contaminated the property, and (4) that the statute of limitations bars plaintiff's breach of contract claim. We therefore affirm.

## BACKGROUND

### I. *Introduction*

In September 1985, ABB Industrial Systems, Inc.'s predecessor, ASEA Industrial Systems, Inc. (hereinafter collectively referred to as "ABB") acquired real property located at 88 Marsh Hill Road, Orange, Connecticut. Beginning in 1989, ABB had the property tested to determine whether the property was contaminated by hazardous chemicals. Those tests indicated that the property was contaminated, principally by perchloroethylene (PCE), but also by trichloroethene (TCE) and 1,1,1–trichloroethane (TCA), all of which are hazardous substances under CERCLA. *See* 40 C.F.R. § 302.4. One report indicated that "releases may have happened both recently (after 1985 when ABB Industrial Systems purchased the site) and prior to 1985." In 1992, ABB began an extensive cleanup of the site.

Because ABB's environmental tests indicated that the site may have been contaminated before ABB acquired it, ABB researched the property's prior ownership and control and determined the following: (1) from 1961 to April 1984, the property was owned by defendant Pacific Scientific Co.'s predecessors, Sigma Instruments, Inc. and International Instruments, Inc. (hereinafter we refer to Pacific Scientific, Sigma Instruments, and International Instruments collectively as "Pacific"); (2) from April 1984 to July 1984, Pacific leased the property to defendant General Resistance, Inc., a division of defendant Prime Technology, Inc. (hereinafter we refer to General Resistance and Prime Technology collectively as "General Resistance"); (3) in August 1984, Pacific sold the property to defendant Zero–Max, Inc., which was then a wholly owned subsidiary of defendant Barry Wright Corp. (hereinafter we refer to Zero–Max and Barry Wright collectively as "Zero–Max"); (4) in September 1985, Zero–Max sold the property to ABB, the current owner. Thus, the chain of ownership or control was as follows: Pacific to General Resistance to Zero–Max to ABB.

ABB sued Pacific, General Resistance and Zero–Max, alleging (1) that under CERCLA, each defendant was partially liable for the costs that ABB had incurred and would incur to assess and clean up the site, (2) that under RCRA, each defendant should be ordered to rectify past mishandling of wastes on the site, (3) that each defendant negligently contaminated the site, and (4) that Zero–Max breached a warranty that it made to ABB in their land-sale contract that the property was in compliance with all environmental laws.

### II. *Summary Judgment Motions*

After extensive discovery, the parties made cross-motions for summary judgment and offered the following evidence.

### A. *Pacific—1961 to April 1984*

From 1961 to April 1984, Pacific owned the property and manufactured circuit boards on it. ABB offered the deposition testimony of several former Pacific employees that Pacific used PCE and TCE to degrease the circuit boards as part of its manufacturing process. Further, ABB offered at least two pieces of evidence which it argued demonstrated that Pacific contaminated the site. First, in 1983

the Connecticut Department of Environmental Protection (CDEP) inspected the site, and in a "Hazardous Waste Inspection" report, the CDEP indicated that there was "[e]vidence of spills" on the property because there was "staining of the asphalt." Second, ABB's expert studied the site, and based on how far PCE had spread, the expert estimated that a spill of PCE occurred some time between 1971 and 1981, and that the spill most likely occurred in 1977.

The district court concluded that there were triable issues of fact as to several of ABB's claims against Pacific, and those claims remain pending in the district court.[1]

### B. General Resistance—April 1984 to July 1984

From April 1984 to July 1984, Pacific leased the property to General Resistance. During those four months, General Resistance's principal activity on site was removing equipment that it had purchased from Pacific. However, General Resistance admitted that it conducted limited manufacturing on site and did not deny that it used the hazardous chemicals at issue as a part of that process.

However, General Resistance asserted that ABB could not offer any evidence that General Resistance spilled chemicals or otherwise contaminated the site. Moreover, General Resistance submitted an affidavit from its Chief Executive Officer, Raymon Sterman, who swore that General Resistance generated a *de minimis* amount of hazardous waste and that the waste which it did generate was always removed by a licensed carrier. Further, Sterman specifically swore that General Resistance "never contaminated the environment or soil."

ABB offered several pieces of evidence which it argued established that General Resistance spilled chemicals or otherwise contaminated the site, and we will discuss ABB's evidence in detail below.

### C. Zero-Max—August 1984 to September 1985

Zero-Max purchased the property from Pacific in August 1984 and owned it until September 1985. When Zero–Max acquired the property, it began an extensive remodeling project, and while that remodeling was taking place, little, if any, manufacturing occurred on site. Around February 1985, Zero–Max moved into the site and used it as its headquarters. From that time until the time it sold the property, Zero–Max conducted limited manufacturing of electronic parts on site as part of research and development projects.[2]

However, like General Resistance, Zero–Max asserted that ABB could not offer any evidence that Zero–Max spilled chemicals or otherwise contaminated the site. Further, Zero–Max submitted the deposition testimony of William K. Healy, a Zero–Max executive, and Jeffrey Williams, a Zero–Max employee, who both testified that no hazardous chemicals were released into the environment while Zero–Max owned the site.

ABB argued that the same evidence that it relied on against General Resistance also established that Zero–Max contaminated the site. Again, ABB's evidence is discussed below.

### D. ABB—September 1985 to Present

In September 1985, ABB acquired the site from Zero–Max. The defendants presented at least two pieces of evidence that demonstrate that ABB was at least partially responsible for the site being contaminated. First, a 1990 environmental report prepared by ABB indicated that a spill of hazardous substances occurred while ABB owned the site. And second, there was an eyewitness

---

1. Because of Pacific's interest in the issues pending on appeal, we granted Pacific leave to file a brief with the Court and to participate in oral argument. However, there has not been a final judgment entered on ABB's claims against Pacific, and we therefore have no jurisdiction over those claims. *See* 28 U.S.C. § 1291.

2. In the district court and on appeal, Zero–Max and ABB have disputed whether Zero–Max ever used the hazardous chemicals at issue on site. Because we conclude below that there is no evidence that Zero–Max contaminated the site, we need not consider the parties' arguments as to whether Zero–Max used the hazardous chemicals at issue.

account of a spill of unknown liquid chemicals that occurred while ABB owned the site.

### III. *The District Court's Decisions*

Despite arguments made by ABB, the district court concluded that there was no evidence that either General Resistance or Zero–Max spilled hazardous chemicals or otherwise contaminated the site. ABB pointed out that there was evidence that Pacific spilled chemicals on site and that the chemicals gradually spread underground (passive migration) while General Resistance and Zero–Max controlled the site. ABB argued that prior owners and operators were liable for passive migration under CERCLA, but the district court rejected that argument. Accordingly, the district court dismissed ABB's CERCLA claims against General Resistance and Zero–Max.

As to ABB's RCRA claims against General Resistance and Zero–Max, the district court dismissed the claims because ABB could not show either that the defendants were presently in violation of an environmental regulation or that the defendants contributed to an imminent environmental hazard. Further, the district court dismissed ABB's negligence claims against General Resistance and Zero–Max, concluding that the claims were barred by the doctrine of *caveat emptor*. Finally, as to ABB's breach of contract claim against Zero–Max, the district court concluded that the statute of limitations had run.

Having dismissed every claim that ABB made against General Resistance and Zero–Max, the district court concluded that there was no just reason to delay entering a final judgment as to those defendants, and the court therefore certified that its decision as to those claims was final and immediately appealable. *See* Fed.R.Civ.P. 54(b). ABB appealed and we granted Pacific leave to intervene in the appeal. We affirm.

### DISCUSSION

■ We review *de novo* a district court's grant of summary judgment. *Hanson v. McCaw Cellular Communications*, 77 F.3d 663, 667 (2d Cir.1996). Summary judgment will be granted if "there is no genuine issue

as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

### I. *CERCLA*

■ Under CERCLA's liability section, 42 U.S.C. § 9607(a), a plaintiff makes a *prima facie* case by establishing that (1) the defendant is a responsible party under section 9607(a), (2) the site is a "facility" as defined in section 9601(9), (3) there has been a release or there is a threatened release of hazardous substances, (4) the plaintiff has incurred costs in response to the release or threatened release, and (5) the response costs conform to the national contingency plan. *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 514 (2d Cir.1996). The only element at issue here is the first, whether General Resistance and Zero–Max are responsible parties.

■ Under section 9607(a)(2) of CERCLA, a prior owner or operator is a responsible party if it controlled the site "at the time of disposal" of a hazardous substance. 42 U.S.C. § 9607(a)(2). CERCLA section 9601(29) adopts the definition of "disposal" from the Solid Waste Disposal Act, 42 U.S.C. § 6903(3), which states, in pertinent part, "[t]he term 'disposal' means the *discharge, deposit, injection, dumping, spilling, leaking, or placing* of any . . . hazardous waste into or on any land or water so that such . . . hazardous waste . . . may enter the environment." (emphasis added). Accordingly, to make out a *prima facia* case, ABB had to establish that a spill, discharge, leak, etc., occurred at the time the defendants controlled the site.

On appeal, ABB argues first, that its evidence creates a triable issue of whether hazardous chemicals were spilled, discharged, leaked, etc. at the time the defendants controlled the site, and second, that the hazardous chemicals that Pacific allegedly spilled continued to passively migrate while General Resistance and Zero–Max controlled the site and that passive migration constitutes "disposal."

## A. *Evidence of Spills*

■ As discussed above, there is evidence that Pacific contaminated the site before either General Resistance or Zero–Max controlled it. Further, General Resistance and Zero–Max have demonstrated that ABB probably contaminated the site after they gave up control. However, both defendants assert that no spill, discharge, leak, etc. occurred at the time they controlled the site.

General Resistance controlled the site for only about four months and its principal activity on site was removing equipment that it had purchased from Pacific. As to whether General Resistance contaminated the site, General Resistance submitted an affidavit from its CEO which stated, *inter alia,* that General Resistance "never contaminated the environment or soil."

Similarly, Zero–Max owned the site for little more than a year, and during that time, conducted only limited manufacturing on site. As to whether Zero–Max contaminated the site, Zero–Max offered deposition testimony from at least two of its employees who testified that Zero–Max did not spill chemicals or otherwise contaminate the site.

■ Further, both defendants also contend that ABB has no evidence that indicates that a spill, discharge, leak, etc. occurred at the time General Resistance and Zero–Max controlled the site. ABB argues that three pieces of evidence show otherwise. First, ABB cites its expert's deposition testimony. However, on the very pages that ABB cites, the expert testified that a spill occurred some time between 1971 and 1981, well before the dismissed defendants controlled the site. Further, when the expert was specifically asked whether a spill occurred *during* the time those defendants controlled the site, the expert stated that he had no opinion on that issue. Second, ABB also relies on reports prepared by its own environmental services division which indicate that spills "may" have occurred before ABB acquired the property. As an initial matter, ABB's reports are plainly hearsay, *see* Fed.R.Evid. 801(c); the reports would therefore be inadmissible at trial and cannot create a triable issue of fact, *see* Fed.R.Civ.P. 56(e) (affidavits "shall set forth such facts as would be admissible in evi-

dence"). Moreover, the reports simply indicate that a spill "may" have occurred before ABB acquired the property—the reports do not state that a spill occurred, much less that a spill occurred at the time the dismissed defendants controlled the site. And third, ABB relies on the 1983 CDEP report which states that stains on the asphalt indicated that a spill had occurred. Because the report was prepared in 1983—well before General Resistance or Zero–Max acquired control of the site—and ABB's reliance on this report is plainly misplaced. We therefore conclude that none of ABB's evidence raises an issue of fact whether a spill, discharge, leak, etc. occurred while the dismissed defendants controlled the site.

Based on the evidence submitted by the parties, a reasonable jury could conclude only that the site was contaminated by Pacific or ABB, or both. However, there is no evidence that either General Resistance or Zero–Max contaminated the site. Accordingly, we conclude that General Resistance and Zero–Max have established that there is no triable issue of fact as to whether a spill, discharge, leak, etc. occurred at the time they controlled the site.

As an aside, ABB argues that requiring it to establish a spill, discharge, leak, etc. at the time the dismissed defendants controlled the site forces it to establish causation, which generally is not an element under CERCLA, *see New York v. Shore Realty Corp.,* 759 F.2d 1032, 1044–45 (2d Cir.1985). However, ABB has not been required to offer any proof as to causation—rather, ABB has simply been required to prove the time at which a disposal occurred. *See id.* at 1044 (requiring a plaintiff to establish ownership "at the time of disposal" does not equate to requiring proof of causation).

## B. *Passive Migration*

■ ABB asserts in the alternative that the hazardous chemicals which Pacific allegedly spilled continued to gradually spread underground (passive migration) while General Resistance and Zero–Max controlled the site, and ABB argues that prior owners are liable for passive migration under CERCLA.

The Third Circuit recently considered this same question, and after considering CERCLA's language, structure and purposes, the court held that prior owners are not liable under CERCLA for passive migration. *United States v. CDMG Realty Co.*, 96 F.3d 706, 712–18 (3d Cir.1996); *see also Joslyn Mfg. Co. v. Koppers Co.*, 40 F.3d 750, 761–63 (5th Cir.1994). We are persuaded by the Third Circuit's reasoning, and rather than reinventing the wheel, we simply summarize below what we believe to be the Third Circuit's most persuasive arguments.

First, disposal is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing" of hazardous chemicals so that they may enter the environment. 42 U.S.C. § 6903(3).[3] None of these terms is commonly used to refer to the gradual spreading of hazardous chemicals already in the ground. *CDMG Realty Co.*, 96 F.3d at 714.

Second, current owners are liable if, *inter alia*, there has been a "release" of hazardous substances. 42 U.S.C. § 9607(a). Unlike the definition of disposal, release is defined to include "leaching," *id.* § 9601(22), which is commonly used to describe passive migration, *see CDMG Realty Co.*, 96 F.3d at 715 & n. 4 (quoting several law journals and cases). That Congress used the term leaching in the definition of release demonstrates that Congress knew that passive migration occurred but decided not to impose liability for it on prior owners. *Id.*

Third, CERCLA provides an "innocent owner" defense. *See* 42 U.S.C. §§ 9607(b)(3), 9601(35); *Westwood Pharmaceuticals v. National Fuel Gas Distribution Corp.*, 964 F.2d 85, 89–91 (2d Cir.1992). To qualify for that defense, a defendant must establish, *inter alia*, that it acquired the site "after the disposal" of hazardous chemicals. 42 U.S.C. § 9601(35)(A). If "disposal" included the gradual spreading of hazardous chemicals spilled before the defendant acquired the site, the innocent owner defense would hardly ever be available. *CDMG Realty Co.*, 96 F.3d at 716. Once hazardous

chemicals are in the ground, they usually spread, and therefore, there would almost never be an identifiable period "after the disposal." *Id.* Congress would not intentionally create a useless defense. Thus, we interpret the word "disposal" as limited to spilling, discharging, leaking, etc., and not to passive migration. *See id.*

■ The *CDMG Realty Co.* Court also relied on its conclusion that the innocent owner defense appeared to be unavailable to prior owners. *See CDMG Realty Co.*, 96 F.3d at 716–17 (quoting 42 U.S.C. § 9601(35)(C), which provides the innocent owner defense and states: "[n]othing in this paragraph . . . shall diminish the liability of any previous owner"). The court reasoned: "if prior owners were liable because waste spread during their tenure . . ., prior owners would be in a significantly worse position than current owners: they would be liable for passive migration of waste" in circumstances where current owners could establish the innocent owner defense. *Id.* The court believed that this fact indicated that disposal does not include passive migration. *Id.* While the court's reasoning on this point is persuasive if one accepts its premise—that the innocent owner defense is not available to prior owners—we have rejected that premise. *Westwood Pharmaceuticals*, 964 F.2d at 91. However, the fact that the *CDMG Realty Co.* Court's argument on this particular point does not carry weight in this Circuit does not undermine the strength of the court's other arguments, which we find persuasive.

Finally, the *CDMG Realty Co.* Court reasoned that its interpretation was consistent with CERCLA policy. One of CERCLA's goals is "to force polluters to pay the cost associated with their pollution." *CDMG Realty Co.*, 96 F.3d at 717; *see also B.F. Goodrich*, 99 F.3d at 514 (CERCLA's purposes include "assuring that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions"). If a person merely controlled a

---

**3.** We note that because the definition of disposal includes "leaking," some courts have concluded that prior owners are liable if they acquired a site with leaking barrels even though the prior owner's actions are purely passive. *See, e.g., Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 844–46 (4th Cir.1992). We express no opinion on this issue.

site on which hazardous chemicals have spread without that person's fault, that person is not a polluter and is not one upon whom CERCLA aims to impose liability.

For these reasons, we hold that prior owners and operators of a site are not liable under CERCLA for mere passive migration. We therefore affirm the district court's grant of summary judgment to General Resistance and Zero–Max on ABB's CERCLA claims.

## II. *RCRA*

■ ABB argues that the district court improperly dismissed ABB's RCRA claims against General Resistance and Zero–Max. RCRA allows a plaintiff to bring a citizen suit under either 42 U.S.C. § 6972(a)(1)(A) or (a)(1)(B).

To establish a violation of section 6972(a)(1)(A), a plaintiff must establish that the defendant is *currently* in violation of a "permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter." *See id.* § 6972(a)(1)(A); *see also Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1315 (2d Cir.1993) (dismissing claim under section 6972(a)(1)(A) because the "claim alleges a 'wholly past' RCRA violation"). As our discussion in the previous section makes clear, ABB cannot demonstrate that General Resistance and Zero–Max are currently in violation of a permit or regulation, and therefore, ABB's claims under section 6972(a)(1)(A) were properly dismissed.

To establish a violation of section 6972(a)(1)(B), a plaintiff must establish that the defendant "has contributed or ... is contributing to the past or present handling, storage, treatment, transportation, or disposal of any ... hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). Because ABB can-

not show that General Resistance or Zero–Max spilled hazardous chemicals or otherwise contaminated the site, ABB cannot establish that the defendants have contributed or are contributing to an endangerment to the environment.

Accordingly, the district court's grant of summary judgment to General Resistance and Zero–Max on ABB's RCRA claims is affirmed.

## III. *Negligence*

■ In its amended complaint, ABB alleged that each defendant "negligently failed to prevent the spillage and release of [hazardous] chemicals into the environment and have caused [ABB] to incur the costs of assessment and clean up as a result." The district court dismissed ABB's negligence claims, concluding that under Connecticut law,[4] the claims were barred by the doctrine of *caveat emptor.*

Whether ABB's negligence claims are barred by the doctrine of *caveat emptor* is a complicated question. ABB pleaded a common law negligence action. However, ABB's claim seems to fall precisely within the following Connecticut statute:

> Any person ... which ... mitigates the effects of ... hazardous wastes resulting from any discharge, [or] spillage ... of such substance ... shall be entitled to reimbursement from any person ... for the reasonable costs expended for such ... mitigation, if such ... hazardous wastes resulted from the negligence or other actions of such person.

Conn. Gen.Stat. Ann. § 22a–452(a) (West 1995).

That ABB pleaded a common law negligence claim but not a claim under section 22a–452(a) raises novel issues of Connecticut law. Connecticut could treat a common law negligence claim that falls within section 22a–452(a) as arising under that section. On the

---

4. The land-sale contract between ABB and Zero–Max provides that their agreement is to be governed by New York law. While both parties have relied on New York law in their arguments relating to ABB's breach of contract claim (discussed below), they both have relied on Connecticut law in their arguments relating to ABB's negligence claim. While never mentioned to this Court, the parties seem to have determined that New York law governs their contract claims while Connecticut law governs their tort claims. We assume without deciding that this is the import of their agreement.

other hand, Connecticut could treat such a claim like any other common law negligence claim. The distinction could be crucial. The Connecticut Supreme Court has indicated that the doctrine of *caveat emptor* generally bars common law negligence claims but does not bar claims under section 22a–452(a). *See Connecticut Resources Recovery Authority v. Refuse Gardens*, 229 Conn. 455, 456–58 & n. 5, 642 A.2d 697 (1994).

However, we need not resolve this issue. Whether ABB's negligence claim is controlled by Connecticut common law or by section 22a–452(a), ABB would have to establish that General Resistance or Zero–Max negligently contaminated the site. Because ABB cannot establish that the defendants contaminated the site at all, ABB's negligence claims were properly dismissed.

## IV. Breach of Contract and Statute of Limitations

On September 11, 1985, Zero–Max sold the site to ABB, and in the land-sale contract, Zero–Max allegedly promised that the site was in compliance with all environmental laws. On September 18, 1991, approximately six years and one week later, ABB sued alleging that Zero–Max breached that promise. Because the parties had agreed to be bound by New York law and because the New York statute of limitations for breach of contract is six years, *see* N.Y. Civ. Prac. L. § 213(2) (McKinney 1990), the district court dismissed the action as untimely.

■ On appeal, ABB makes a number of arguments why the district court's decision should be reversed. Initially, we note that state law generally controls issues relating to

a state statute of limitations, *Personis v. Oiler*, 889 F.2d 424, 426 (2d Cir.1989), and we will therefore look to New York law to evaluate ABB's arguments.

■ First, ABB argues that the limitations period did not begin to run until the time ABB discovered, or should have discovered, that the contract was breached. However, in New York it is well settled that the statute of limitation for breach of contract begins to run from the day the contract was breached, not from the day the breach was discovered, or should have been discovered. *See, e.g., Ely–Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 402–04, 599 N.Y.S.2d 501, 502–04, 615 N.E.2d 985, 986–88 (1993); *National Life Ins. Co. v. Frank B. Hall & Co. of New York*, 67 N.Y.2d 1021, 1023–24, 503 N.Y.S.2d 318, 319, 494 N.E.2d 449, 450 (1986). Here, the contract was breached, if at all, on the day it was executed, and therefore, the district court correctly concluded that the statute began to run on that day.[5]

■ Second, ABB argues that its breach of contract claim should be treated as a fraud claim, which claims are governed by a six year statute of limitations that begins to run when the fraud was discovered or should have been discovered, *see* N.Y. Civ. Prac. L. § 213(8). However, in its complaint, ABB made only a breach of contract claim and did not plead facts which would support a fraud claim. Therefore, ABB's argument that its claim should be treated as a fraud claim must fail.

■ Third, pursuant to CERCLA, 42 U.S.C. § 9659(d)(1), and RCRA, 42 U.S.C. § 6972(b)(1)(A) & (b)(2)(A), ABB sent notice of intent to sue letters to General Resistance

---

**5.** Under 42 U.S.C. § 9658, if a claim is brought under state law for property damages caused by hazardous chemicals and state law does not provide a discovery rule, the state statute of limitations cannot begin to run until the plaintiff knew or should have known that the damages were caused by hazardous chemicals. Because ABB never raised this section on appeal, any argument relating to it is waived. *See* Fed. R.App. P. 28(a)(6) (the appellant's brief "must contain the contentions of the appellant on the issues presented"); *LoSacco v. City of Middletown*, 71 F.3d 88, 92–93 (2d Cir.1995). We note however that the section appears to purport to change state law, and is therefore of questionable constitu-

tionality. *See Printz v. United States*, —— U.S. ——, —— – ——, 117 S.Ct. 2365, 2371–2384, 138 L.Ed.2d 914 (1997); *New York v. United States*, 505 U.S. 144, 161, 112 S.Ct. 2408, 2420–21, 120 L.Ed.2d 120 (1992) ("this Court never has sanctioned explicitly a federal command to the states to promulgate and enforce laws and regulations" (internal quotation marks omitted)); Alfred R. Light, *New Federalism, Old Due Process, and Retroactive Revival: Constitutional Problems With CERCLA's Amendment of State Law*, 40 U. Kan. L.Rev. 365 (1992). We will not address the issue of the constitutionality of section 9658 today.

and Zero–Max in May 1991. ABB argues these notification letters should be deemed as commencing its action. For this argument, ABB relies on N.Y. Civ. Prac. L. § 203, Practice Commentaries C203:2, which state, in pertinent part: "When two services are required [by New York law] to obtain jurisdiction, the first is just as likely to give notice to the defendant ... [and] it is submitted that the first of the two services should stop the statute of limitations." The Practice Commentaries clearly discuss only services of process as opposed to notice of intent to sue letters, and ABB's argument that notice of intent to sue letters commence an action is meritless. Moreover, as the Practice Commentaries acknowledge, New York courts seem to have rejected the Practice Commentaries' position.

Finally, ABB argues that the sixty-day CERCLA waiting period tolled the statute of limitations for ABB's breach of contract action. Section 9659(d)(1) of CERCLA requires a plaintiff to wait sixty days after a CERCLA notice of intent to sue letter has been sent before the plaintiff can commence an action under CERCLA. In New York, "[w]here the commencement of an action has been stayed ... by statutory prohibition, the duration of the stay is not a part of the time within which the action must be commenced." N.Y. Civ. Prac. L. § 204(a). However, as long as a party remains free to pursue a claim, the statute of limitations on that claim is not tolled while a party pursues related causes of action. *ISCA Enterprises v. City of New York*, 77 N.Y.2d 688, 697, 569 N.Y.S.2d 927, 931, 572 N.E.2d 610, 614 (1991) (citing *Board of Regents of the University of the State of New York v. Tomanio*, 446 U.S. 478, 486–87, 100 S.Ct. 1790, 1796–97, 64 L.Ed.2d 440 (1980), which, while discussing the law of the State of New York law, stated: "No section of law provides ... that the time for filing a cause of action is tolled during the period in which a litigant pursues a related, but independent cause of action."). Here, section 9659(d)(1) of CERCLA did not prohibit ABB from pursuing its breach of contract action. Therefore, borrowing from the *ISCA Enterprises* Court's language, "[ABB] was free to bring its [contractual] challenge regardless of its decision to pursue a [CERC-

LA claim], and pursuit of [the CERCLA claim] should therefore have no tolling effect." *See ISCA Enterprises*, 77 N.Y.2d at 697, 569 N.Y.S.2d at 931, 572 N.E.2d at 614. Additionally, although not critical to our decision, we note that even after the sixty day CERCLA waiting period expired, ABB still had two months to file its claim before the statute of limitations expired.

Accordingly, we conclude that ABB's breach of contract claim was barred by the statute of limitations.

## CONCLUSION

The district court's judgment dismissing all of ABB's claims against General Resistance and Zero–Max is affirmed.