AMW MATERIALS TESTING, INC. and Anthony Antoniou, Plaintiffs,

v.

TOWN OF BABYLON, and the North Amityville Fire Company, Inc., Defendants.

No. 01CV4245 (ADS)(ETB).

United States District Court, E.D. New York.

Dec. 20, 2004.

Lustberg & Ferretti, Glens Falls, NY (Robert M. Lustberg, of Counsel), for Plaintiffs.

Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, (Richard Ricci, Stephen W. Smithson, of Counsel), for the Defendants.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This case arises out of a fire at an industrial facility that resulted in the release of toxic chemicals into the environment. The Town of Babylon ("Town") and the North Amityville Fire Company, Inc. ("Fire Company" or "NAFC") (collectively, the "Defendants"), responded to extinguish the fire. The land owner, Anthony Antoniou and the business, AMW Materials Testing, Inc. ("AMW") (collectively, the "Plaintiffs"), whose use of a highly flammable solvent caused the fire, seek contribution, indemnification, and damages from the Defendants under federal and state law. In an apparent case of first impression, the Plaintiffs claim, among other things, that the Town and the Fire Department are liable under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9607 (2004), as "operators" of the facility. Presently before the Court are motions by the Defendants for summary judgment and by the Plaintiffs for partial summary judgment.

## I. BACKGROUND

AMW operated an industrial facility located within the Town and the NAFC fire protection district. At its facility, AMW performed non-destructive testing, anodizing, alodine coating, and painting of parts for the aircraft industries. Some of the chemicals used at the AMW facility were hazardous substances as defined under CERCLA. According to the Plaintiffs, some of these chemicals included: sodium chromate, Ammonium Flouride, Chromic Acid, Sodium Benzoate, Boric Acid, Aluminum Sulfate, Oakite 164 and 160, Sulfuric Acid, Nitric Acid Reagent, MX Carrier (Kerosene), Zyglo–Bentinite, and Methyl Ethyl Ketone (MEK). The facility also

had three 1000 gallon storage tanks for Chromic Acid, Sulfuric Acid, and Alodine Anodize.

AMW was authorized by the Suffolk County Health Department to store certain toxic chemicals and the facility was allegedly in compliance with all Town fire codes. AMW also applied for and received permits for the storage tanks and for the use of certain hazardous materials. In accordance with the Town code, the facility had a specially constructed paint room to minimize the risk of fire. The paint room had a concrete floor; double 5/8″ fire resistant wallboard on the walls and ceilings; two spray booths with filters and exhaust fans; and spark resistant electrical appliances. The Plaintiffs believed that these precautions were necessary to ensure that, in the event of a fire, it would take more than an hour for it to burn through to the other parts of the building, and to reduce the possible sources of fire such as electric spark. For these improvements, AMW applied for and received annual Fire Prevention Permits from the Town.

On October 9, 2000, sometime before 3:00 p.m., a fire broke out at the AMW facility inside the paint room. At that time, AMW employees were cleaning a long tube with MEK in the paint room. Antoniou, who owns the land and also is the President of AMW, entered the paint room and noticed a small flame on the floor. Antoniou and the AMW employees then attempted to extinguish the fire themselves. Antoniou retrieved a chemical fire extinguisher located outside the paint room while the employees used one that was located in the room. All of them attempted to extinguish the flames, but their efforts failed. The flames began to ignite the large filters in the paint room's ventilation system. Antoniou recognized that they would not be able to extinguish the flames by themselves and ordered the employees out of the building.

Sometime while the Plaintiffs were attempting to extinguish the flames, AMW's automatic fire alarm company contacted AMW to notify them that the alarm system indicated a fire in the building. The AMW secretary confirmed the existence of a fire in the building and then left the building with the other employees. At 3:05 p.m., the automatic fire alarm company notified Babylon Central Fire & Rescue Alarm Corporation ("Babylon Fire Rescue") about the fire at AMW, which was located at 666 Albany Avenue in the North Amityville Fire Protection District. At the same time, a Suffolk County Police Department police officer on patrol noticed the fire and notified Babylon Fire Rescue. Having been alerted, Babylon Fire Rescue dispatched the NAFC, the volunteer fire department responsible for responding to fire emergencies in the North Amityville Fire Protection District.

The following summary of fire scene communications from Babylon Fire Rescue generally describes how the fire evolved. At 3:08 p.m., the First Assistant Chief of the NAFC arrived on the scene and confirmed that the facility was on fire. At 3:10 p.m., the Chief of the NAFC, Willie Tutt ("Chief"), arrived and assumed command and control of the fire scene. At 3:12 p.m., the first fire engine arrived and the Chief requested that additional fire departments, the Town Fire Marshals, the Town Fire Coordinators, and the New York State Department of Environmental Conservation respond. At 3:22 p.m., a Town fire marshal confirmed that there was a toxic spill and advised that there were no toxic fumes at the fire scene. At 3:34 p.m., two fire departments were requested to respond to help in evacuations. In total, four additional fire departments responded to the fire with numerous fire

apparatus, including, the North Lindenhurst Fire Department, East Farmingdale Fire Company, Lindenhurst Fire Department, and Copaigue Fire Department.

The descriptions of the fire from the affidavits and depositions of both the Plaintiffs and the Defendants provide more detail. Antoniou states in his affidavit that almost immediately after he exited the building the Chief had already arrived. The Plaintiffs informed the Chief about the details and location of the fire and offered to help. The Chief declined the offer and requested that Antoniou and his employees move to a safe location. The Chief testified at his deposition that when he arrived at the scene the building had become "fully involved," that is, fire and heavy smoke were coming out of the entire building. According to affidavits from the first firefighters to arrive, their fire truck had to inch down the street as they approached due to the heavy smoke condition in the immediate area. Once on the scene, they began to enter the structure to search for victims and attempt to extinguish the fire but were unable to apply any water on the fire due to the thick black smoke and high heat. Firefighters determined that the fire had extended to such a point that there was a serious risk that the building would collapse, which could cause serious injury or death. Pictures taken from outside the building during this time confirm the firefighters' descriptions of the intense fire throughout the building and the imminent signs of collapse.

Due to the intensity of the fire, Chief Tutt decided to abandon attacking the fire from the inside of the structure. Chief Tutt ordered that the fire be extinguished by way of "defensive operations," which involves applying large caliber streams of water from elevated platforms operated from a safe distance. By the time these devices were operational, the roof had reportedly collapsed and the flames were burning well above the top of the building. As the fire continued to burn, a storage trailer located adjacent to the building disintegrated. The trailer contained 55 gallon drums that exploded causing them to shoot into the air.

Eventually the fire darkened down, but remained burning under the partially collapsed building. At 4:26 p.m., Chief Tutt requested a pay loader from the Town to aid in extinguishing the fire and to take down the remaining walls that threatened to collapse. At 5:42, Chief Tutt requested that the Town provide a sand truck to help build a dyke to contain the runoff of water that contained toxic chemicals. Babylon Fire Rescue records show that the NAFC remained at the facility until approximately 1:00 a.m.

As a result of the fire, virtually all of the building and its contents were destroyed and contaminated with hazardous materials. Post-fire testing of the property by the Suffolk County Department of Health Services showed that the soil was contaminated with numerous toxic substances. In addition, tests performed by the New York State Department of Environmental Conservation revealed that numerous nearby storm drains and a recharge basin were adversely impacted by the runoff of the water used to control the fire. AMW claims that it has spent in excess of one million dollars in response, removal, and containment efforts. AMW has not resumed the business after the fire and the clean up of the site is still not complete.

During the fire, Plaintiffs retained Chemical Pollution Resources, Inc. to evaluate and direct the disposal of the hazardous materials. Thereafter, Plaintiffs voluntarily undertook cleanup efforts by contracting with Allied–All City Plumbing and Long Island Analytical Laboratories, Inc. to carry out the disposal of the

hazardous substances. It appears that all removal and remediation activities at the site were undertaken in accordance with applicable laws and regulations. The New York State Department of Environmental Conservation, as well as local County and Town officials monitored the cleanup but never took judicial or administrative measures to compel cleanup.

On June 22, 2001, the Plaintiffs commenced this action seeking to hold the Defendants liable for the damages that resulted from the fire. Some of the losses include the cost of environmental remediation that the Plaintiffs undertook by reason of the escape of hazardous and toxic materials from the AMW facility during the fire. Plaintiffs also seek damages due to lost profits and punitive damages. Plaintiffs assert causes of action under sections 107 and 113 of CERCLA, common law negligence, strict liability for ultrahazardous activity, and joint and several liability under the New York Navigation Law. Presently before the Court are the Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 and Plaintiffs' motion for partial summary judgment on the New York Navigation Law claim.

## II. DISCUSSION

### A. Summary Judgment Standard

A motion for summary judgment should be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2550, 91 L.Ed.2d 265 (1986). The moving party bears the burden of establishing the absence of a genuine issue of material fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). "When a movant demonstrates through competent evidence that no material facts

are genuinely in dispute, the non-movant 'must set forth specific facts showing that there is a genuine issue for trial.'" Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir.1990) (quoting Fed. R.Civ.P. 56(e)) see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." Id. (internal quotations and citations omitted); see Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998). "The 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." Niagara Mohawk Power Corp. v. Jones Chemical Inc., 315 F.3d 171, 175 (2d Cir. 2003) (quoting Anderson, 477 U.S. at 252, 106 S.Ct. 2505, 91 L.Ed.2d 202).

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14 (1986); Vann v. City of New York, 72 F.3d 1040, 1048–49 (2d Cir. 1995). Disputed facts that are not material to the issue at hand will not defeat summary judgment. See Anderson, 477 U.S. at 248, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of judgment." Id. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. If there is evidence in the record, including affidavits, exhibits, interrogatory answers, and depo-

sitions, as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Lane v. New York State Electric & Gas Corp.*, 18 F.3d 172, 176 (2d Cir.1994).

Notably, "the trial court's task at the summary judgment motion state of litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to decide them. Its duty, in short, is confined at this point to issue-finding, it does not extend to issue resolution." *Gallo v. Prudential Residential Servs. Ltd.*, 22 F.3d 1219, 1224 (2d Cir.1994); *see Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 57 (2d Cir.1987) (holding that on a motion for summary judgment, the court "cannot try issues of fact; it can only determine whether there are issues to be tried").

## B. CERCLA

The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), also known as the Superfund Law, regulates the release of hazardous substances and the cleanup of sites where hazardous substances have come to be located. 42 U.S.C. §§ 9601–75 (2004). CERCLA permits private parties to "pursue contribution or indemnification from potentially responsible parties for expenses incurred responding to environmental threats." *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 326 (2d Cir.2000) (citation omitted); 42 U.S.C. § 9607(a)(4)(B). An "innocent" party may seek indemnification for full recovery of costs under § 9607(a)(4)(B). *Bedford Affiliates v. Sills*, 156 F.3d 416, 424 (2d Cir. 1998). On the other hand, under § 9613(f)(1), a party that is itself liable may seek contribution for those costs ex-

ceeding its pro rata share of the cleanup expenditure. *Bedford*, 156 F.3d at 424.

## 1. Contribution

██ The Plaintiffs' first amended complaint seeks recovery under both § 9607 for indemnification and § 9613 for contribution. However, the Plaintiffs' claim for contribution is not authorized under the terms of § 9613. As recently held by the Supreme Court, "contribution may only be sought subject to ... specified conditions, namely, 'during or following' a specified civil action." *Cooper Indus. v. Aviall Servs.*, —— U.S. ——, 125 S.Ct. 577, 583, —— L.Ed.2d —— (2004). CERCLA provides, "Any person may seek contribution from any other person who is liable or potentially liable under [§ ] 9607(a), during or following any civil action under [§ ] 9606 of this title or under [§ ] 9607(a) of this title." 42 U.S.C. § 9613. As stated in the statute, specified civil actions include suits by the Government for abatement under § 9606 and civil actions under § 9607 for indemnification. The Court in *Cooper* explained that no provision in CERCLA exists for maintaining an action for contribution when the cleanup is purely voluntary. *Cooper*, 125 S.Ct. at 584. Here, the Plaintiffs voluntarily initiated cleanup of the site and cannot satisfy the requirement of an existing "specified civil action." As such, a claim for contribution under § 9613 is not permitted.

## 2. Indemnification

██ The Plaintiffs also seeks indemnification, or full recovery of costs, under § 9607(a). In order to bring a claim under CERCLA for indemnification, the plaintiff must be an innocent party *See Commander*, 215 F.3d at 332. "[P]otentially responsible parties may pursue only contribution claims against other potentially responsible parties and may not seek indemnifica-

tion." *Id.* Potentially responsible parties are barred from seeking indemnification because such a claim, if successful, holds the other party liable for the entire cost of the cleanup. *Bedford,* 156 F.3d at 423–24. Thus, if the Plaintiffs are potentially responsible, they may not maintain an action for indemnification.

■■ A party is potentially responsible under CERCLA for costs associated with a toxic spill at a site, if: (1) the site is a "facility;" (2) a release or threatened release of a "hazardous substance" from the site has occurred; (3) the release or threatened release has caused the plaintiff to incur response costs; and (4) the defendant falls within at least one of the four classes of responsible persons described in § 9607(a) of CERCLA. 42 U.S.C. § 9607(a); *U.S. v. Alcan Aluminum Corp.,* 315 F.3d 179, 180 (2d Cir.2003). The four classes of responsible parties are (1) the current owner and operator of the facility; (2) the owner or operator of the facility at the time hazardous substances were disposed there; (3) any person who generated or arranged for the treatment or disposal of a hazardous substance at the facility; and (4) any person who transported hazardous substances to the facility. 42 U.S.C. § 9607(a)(1)-(4); *see also Commander,* 215 F.3d at 326; *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1198 (2d Cir.1992). Potentially responsible persons are held strictly liable for cleanup costs incurred by any other person. *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 514 (2d Cir.1996); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1042 (2d Cir.1985). Thus, under the plain language of the statute, it would appear that the Plaintiffs are potentially responsible under § 9607(a).

CERCLA provides a limited number of affirmative defenses. "Liability under § 9607(a) is precluded only by a defense that the release or threatened release was caused solely by an act of God, an act of war, or certain acts or omissions of third parties other than those with whom a defendant has a contractual relationship." *Murtha,* 958 F.2d 1192, 1198 (2d Cir.1992); *see* 42 U.S.C. § 9607(b). Despite the inapplicability of these defenses, the Plaintiffs set forth three theories as to why they are not potentially responsible parties: (1) the site was not a "facility" within the meaning of CERCLA until the Fire Company responded; (2) AMW was not an "operator" of the site within the meaning of CERCLA; and (3) Antoniou was an innocent owner.

### a. "Facility" Defense

■ The term "facility" is defined in section 101 of CERCLA. "Facility" means "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). "Hazardous substance" is defined to include any element, compound, mixture, solution, or substance designated by the Environmental Protection Agency (EPA) as presenting substantial danger to the public health or welfare or the environment when released to the environment. *Id.* § 9601(14). Thus, to establish that a site is a "facility" under CERCLA, one need only show that a hazardous substance has been placed there or has otherwise come to be located at the site.

■ The Plaintiffs' argument that the site was not a facility under CERCLA defies logic. A critical element to the Plaintiffs' claim for indemnification is that hazardous substances contaminated the site. The Plaintiffs admit that their business used and stored various types of hazardous chemicals, including sodium chromate, Ammonium Fluoride, Chromic Acid, Sodium Benzoate, Boric Acid, Aluminum Sulfate, Oakite 164 and 160, Sulfuric Acid,

Nitric Acid Reagent, Zyglo–Bentinite, and Methyl Ethyl Ketone (MEK). Moreover, the Plaintiffs admit that the property contained a 1000 gal Chromic Acid tank, a 1000 gal Sulfuric Acid tank, and a 1000 gal Alodine Anodize tank. Based upon the storage of these hazardous substances alone, the site was clearly within the definition of a "facility" in CERCLA before the fire started.

### b. Operator Defense

■■ The gravamen of the Plaintiffs' claim is that the Defendants, and not AMW, actually operated the facility under the meaning of the CERCLA provisions. It is well-settled that both current operators of a facility and operators at the time of release are responsible parties regardless of who caused the release of hazardous substances. *New York v. Nat'l Servs. Indus. Inc.*, 352 F.3d 682, 684 (2d Cir. 2003); *Shore Realty*, 759 F.2d at 1044. The term "operator" in the case of a facility means: "any person who : . . operated, or otherwise controlled activities at such facility immediately beforehand." 42 U.S.C. § 9601(20)(A). Under CERCLA, "any person who operates a polluting facility is directly liable for the costs of cleaning up the pollution." *U.S. v. Bestfoods*, 524 U.S. 51, 65, 118 S.Ct. 1876, 1886, 141 L.Ed.2d 43 (1998). "This is so regardless of whether that person is the facility's owner, the owner's parent corporation or business partner, or even a saboteur who sneaks into the facility at night to discharge its poisons out of malice." *Id.* (citation omitted). For purposes of CERCLA, the Supreme Court has held that "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.*

■ The actions of a Government entity at a site may give rise to operator liability. . "CERCLA expressly includes municipalities, states, and other political subdivisions within its definition of persons who can incur such liability under § 9607." *Murtha*, 958 F.2d at 1198. State and local governments are held to the strict liability standard in the same manner as any other potentially responsible party. However, if the Government has acquired ownership or control of the facility involuntarily, as a result of its sovereign function, or the entity was responding to an emergency caused by the release of hazardous substances from a facility owned by another party, the State or local government is only liable for gross negligence or willful misconduct. 42 U.S.C. § 9607(d)(2); *see Murtha*, 958 F.2d at 1198.

■ In order to establish that a Government entity is subject to strict liability as an operator, a plaintiff must show some nexus to the site other than its statutory obligation to respond to an emergency. *See Stilloe v. Almy Bros., Inc.*, 782 F.Supp. 731, 736 (N.D.N.Y.1992) (holding that the State was not liable as an operator for responding to a site to conduct clean-up activities). Mere regulatory oversight by the Government is also insufficient to create operator status. *See, e.g., United States v. Dart Indus., Inc.*, 847 F.2d 144, 146 (4th Cir.1988) (holding that a state agency was not an operator solely by conducting inspections and issuing permits); *United States v. New Castle County*, 727 F.Supp. 854, 854 (D.Del.1989) (holding that a state's regulation of a hazardous waste site did not make it an "operator" of the site).

■ Here, the Plaintiffs argue that the Fire Company operated the facility because it exercised authority over the property during the course of the fire. The Plaintiffs do not allege any activities that

the Defendants conducted in connection with the facility other than responding to emergencies and issuing of permits for the storage and use of hazardous substances. Instead, the Plaintiffs urge the Court to find that the Defendants operated the facility under CERCLA because the Defendants were in exclusive control of the property during the fire; conducted "operations" at the site; and prohibited the Plaintiffs from reentering the facility during the course of the fire. For example, Chief Tutt directed the placement of water streams into the fire; told Antoniou to relocate to a safe location off the property; and directed the use of payloaders during the fire.

These allegations alone are insufficient to support the claim that the Defendants were operators of the facility. The Plaintiffs' argument misconstrues the term "operator of a facility" to have the same meaning as conducting firefighting operations at the facility. The Fire Company, pursuant to its contract with the Town to provide fire protection, may regulate the conduct at a scene where it is extinguishing a fire. *See* N.Y. Town Law § 130 (McKinney 2004). In addition, a person may be charged with a crime if she intentionally and unreasonably obstructs the efforts of firefighting operations. *See* N.Y. Penal Law § 195.15 (McKinney 2004). In order to safely and effectively respond to an emergency, responding parties, like fire departments, need to have some control over emergency situations. Failure to control the fire scene would be considered negligent, and could subject the fire department to liability. However, under the rubric of CERCLA, these powers do not confer "operator" status on the fire department while its members extinguish a fire inside the facility. CERCLA requires that one "manage, direct, or conduct operations specifically related to pollution . . . or decisions about compliance with environmental

regulations." *Bestfoods,* 524 U.S. at 65, 118 S.Ct. at 1886. The uncontroverted evidence reveals that the Plaintiffs, and not the Defendants, were operating the facility immediately before the release; during the release; and are currently operating the facility within the meaning of the CERCLA statute.

It is undisputed that the release or threatened release occurred while AMW's employees were cleaning a tube with MEK. Antoniou testified at his deposition that the fire started as a result of MEK igniting inside the facility. Once ignited, the MEK threatened release into the environment. By attempting to extinguish the fire themselves, the Plaintiffs took steps to control and prevent the release of hazardous materials. The ensuing fire destroyed the premises and released other hazardous substances into the environment. This undisputed evidence shows that, as a matter of law, AMW was operating the facility immediately before the release of the hazardous substance and during the release.

■ Finally, although AMW has not conducted a profitable business operation at the facility after the fire, it has been the "operator" within the meaning of CERCLA as interpreted by the Supreme Court in *Bestfoods.* During the fire, AMW hired a contractor to coordinate the disposal efforts at the facility. After the fire, AMW continued to pay for the disposal of the hazardous substances. In fact, AMW is seeking recovery of those costs and lost profits. Therefore, the Court finds that AMW is and has been operating the facility by directing operations relating to disposal of hazardous waste. *See id.* Accordingly, the Court finds that the Plaintiffs' have offered no material evidence that the Fire Company or the Town was the operator of the facility under CERCLA. Since the Defendants

were not operators of the facility, they may only be liable for gross negligence or willful misconduct under § 9607(d)(2). Later in this opinion, the Court will analyze the Plaintiffs' claims relating to negligence.

### c. Innocent Owner Defense

 Antoniou claims that he is not a responsible party under CERCLA because he is an innocent owner. CERCLA provides for an innocent owner defense under §§ 9607(b)(3) and 9601(35). *See Westwood Pharmaceuticals v. National Fuel Gas Distribution Corp.*, 964 F.2d 85, 89–91 (2d Cir.1992). "To qualify for that defense, a defendant must establish, inter alia, that it acquired the site 'after the disposal' of hazardous chemicals." *ABB Indus. Systems, Inc. v. Prime Technology, Inc.*, 120 F.3d 351, 358 (2d Cir.1997) (citation omitted). Here, there is no dispute that Antoniou owned the property before, during, and after the release of hazardous chemicals. As such, Antoniou cannot assert the innocent owner defense.

The Court finds that the Plaintiffs have not raised any dispute of material fact relating to the CERCLA claim and that the Defendants are entitled to judgment as a matter of law. The Plaintiffs were the owner and operator of the facility at the time the hazardous substances were released into the environment. The Defendants cannot be considered "operators" of the facility by merely responding to and extinguishing a fire at the site. The Plaintiffs, as responsible parties, may not maintain an action for indemnification under CERCLA. The Plaintiffs claims for contribution must also fail because they voluntarily initiated clean-up of the site, and thus cannot meet the requirement of a preexisting civil action. For these reasons, the motion of the Defendants for summary judgment dismissing the Plaintiffs' CERCLA claims is granted.

### C. Negligence

 It is well-established that a municipality may not be held liable for injuries resulting from negligence in the performance of a governmental function, unless the plaintiff can establish the existence of a special relationship between the injured party and the public entity. *Apostolakis v. Centereach Fire District*, 300 A.D.2d 516, 516, 752 N.Y.S.2d 691, 692 (2d Dep't 2002); *see also Cuffy v. City of New York*, 69 N.Y.2d 255, 260, 505 N.E.2d 937, 939–40, 513 N.Y.S.2d 372, 374 (1987); *Howell v. Massapequa Fire District*, 306 A.D.2d 317, 318, 760 N.Y.S.2d 679, 679 (2d Dep't 2003). "In order to successfully invoke the 'special duty' exception . . ., a plaintiff must establish that, through affirmative acts, the municipality has lulled him or her into foregoing other available avenues of protection or that it has voluntarily assumed a duty separate from that which is owed to the public generally." *Bishop v. Bostick*, 141 A.D.2d 487, 488, 529 N.Y.S.2d 116, 117–18 (2d Dep't 1988).

 The Plaintiffs in this case argue that a special relationship existed based on previous contact with the Defendants and detrimental reliance. The previous contact that the Plaintiffs assert includes personal conversations with Town and Fire Company officials; site visits by Town Fire Marshals; previous responses by the Fire Company to the facility for false alarms; and the submission of site plans to the Town. As for reliance, the Plaintiffs submit that Chief Tutt had visited the facility on prior occasions, had knowledge of the hazardous chemicals in the building, and at the fire, Chief Tutt ordered the Plaintiffs off the premises. The Plaintiffs argue that, had they not listened to Chief Tutt, the Plaintiffs could have used fork

lifts to remove materials during the fire and minimized the damage to the land.

The Court finds that any visits to or knowledge of the property prior to the fire is immaterial to the issue of whether the Defendants' assumed a special duty other than the one owed to the general public. "Since the Fire [Company's] act of arriving at the scene of what was then only a potential disaster constituted nothing more than the performance of a duty owed to the public generally, that act alone is insufficient to create a special duty to the respondents." *Bishop*, 141 A.D.2d at 488, 529 N.Y.S.2d at 118. Similarly, knowledge of hazardous substances, prior visits, and the issuance of valid permits constitute nothing more than the performance of duties owed to the public in general. Furthermore, by the time the Defendants arrived at the Plaintiffs' business, the fire had already extended throughout the building, making any prior knowledge of the hazardous substances irrelevant to the Plaintiffs' claim for damages to the property.

Plaintiffs' detrimental reliance argument is absurd. Antoniou argues that a special relationship exists because he relied on Chief Tutt's direction to stay out of the building and keep a safe distance from the fire. Incredibly, Antoniou claims that absent those instructions he would have ordered his employees back into a fully fire-engulfed building that was about to collapse. A special relationship requires reliance to the claimant's detriment. *De Long v. Erie County*, 60 N.Y.2d 296, 305–06, 469 N.Y.S.2d 611, 616–17, 457 N.E.2d 717, 721 (1983). As a matter of law, fact, and common sense, Antoniou's reliance on Chief Tutt's instructions not to send employees back into a burning building filled with hazardous and flammable chemicals cannot be considered detrimental.

■ In addition, even if a special duty was present, a fire department is not chargeable with negligence for failure to exercise perfect judgment in discharging the governmental function of fighting fires. *Harland Enterprises, Inc. v. Commander Oil Corp.*, 64 N.Y.2d 708, 709, 475 N.E.2d 104, 105, 485 N.Y.S.2d 733, 734 (1984). In *Harland*, the plaintiff brought an action against the fire department for alleged negligence in the methods it used to fight the fire. The *Harland* Court held that "[t]he fire department's discretionary efforts in attempting to extinguish the fire ... are not grounds for liability." *Harland*, 64 N.Y.2d at 709, 475 N.E.2d at 105, 485 N.Y.S.2d at 734. That principle applies here. Chief Tutt exercised sound judgment in ordering that the fire be fought from a safe distance with copious amounts of water. This tactic achieved the Fire Company's primary goals of preserving life and extinguishing the fire, and thus cannot be considered negligent.

The Chief also took remedial action after the fire was extinguished. The Chief ordered the Town to use pay loaders to move debris in order to help extinguish the fire. The Chief also ordered sand trucks to help dyke the toxic runoff. These actions, as a matter of law, cannot be considered grossly negligent. Accordingly, the Defendants are entitled to summary judgment dismissing all of the Plaintiffs' negligence claims.

### D. Ultrahazardous Activity

■ The Plaintiffs claim that the Defendants engaged in ultrahazardous activity by applying high pressure water to the fire. This claim alleges that the application of water caused the fire to spread, ignited chemicals within the building, and caused the flow of contaminated water onto the premises and adjoining properties. The general rule is that those who engage in ultrahazardous activity are sub-

ject to strict liability for the cost of harm caused on the innocent. *Doundoulakis v. Town of Hempstead,* 42 N.Y.2d 440, 448, 368 N.E.2d 24, 27, 398 N.Y.S.2d 401, 404 (1977). Determining whether an activity is ultrahazardous involves an analysis of multiple factors, such as: " '(a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) [the] extent to which its value to the community is outweighed by its dangerous attributes.' " *Searle v. Suburban Propane Div. of Quantum Chemical Corp.,* 263 A.D.2d 335, 339, 700 N.Y.S.2d 588, 591 (3d Dep't 2000) (quoting *Doundoulakis,* 42 N.Y.2d at 448, 398 N.Y.S.2d 401, 368 N.E.2d 24).

■ In this case, the sixth factor, the value to the community, is particularly instructive. Although firefighting is an extremely dangerous activity, the value to the community outweighs the inherent dangers of the activity. If the fire department had not extinguished the fire, the risk of it spreading to nearby structures would have put the entire community in great danger. The fifth element, inappropriateness of the activity to the place where it is carried on, demonstrates the weakness of the Plaintiffs' claim. It is illogical to claim that it is inappropriate to carry out firefighting at the site of a fire. Thus, the Court finds the claim for strict liability meritless and should be dismissed.

### E. The New York Navigation Law

Plaintiffs move for partial summary judgment against the Town on their claim under the New York Navigation Law. The Plaintiffs assert that the Town had actual knowledge that MX/MG Carrier II, commonly known as kerosene, was stored on the property and that as a result of the Town's role in fighting the fire, the kerosene was released during the course of the fire. Generally, "any person who has discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages...." N.Y. Nav. Law § 181(1) (McKinney 2004). However, volunteer fire companies and their members are exempt from strict liability and only liable for willful or gross negligence. *Id.* § 181(6).

■ Antoniou testified at his deposition that he observed a Town Highway Department front end loader being used after the fire within the building knocking over containment vessels. The Defendants do not dispute that the Town was moving debris around after the fire, but it is undisputed that the Town was acting at the direction of Chief Tutt and the Fire Company in their effort to extinguish the fire. As such, the Town is covered under the volunteer firefighter exemption to strict liability and is only liable for gross negligence. Regardless of the standard, after being subject to an intense fire for several hours, it is highly improbable that any kerosene remained in the containers by the time the Town was using the pay loader, especially considering the testimony that some time during the fire explosions were heard inside the facility. As discussed above, the Court finds that the Defendants did not act negligently in extinguishing the fire or by ordering the use of pay loaders. Therefore, the Court finds that the Defendants are entitled to summary judgment on the Plaintiffs' claim under the New York Navigation Law.

### III. CONCLUSION

Based on the foregoing, it is hereby

18

ORDERED, that the Plaintiffs' cross motion for partial summary judgment is **DENIED**; and it is further

ORDERED, that the Defendants' motion for summary judgment is hereby **GRANTED** and the complaint is dismissed in its entirety; and it is further

ORDERED, that the Clerk of the Court is directed to close the case.

**SO ORDERED.**