ELEMENTIS CHEMICALS
INC., Plaintiff,

v.

T H AGRICULTURE AND NUTRI-
TION, L.L.C., and Philips Electronics
North America Corporation, Defen-
dants.

Phillips Electronics North America
Corporation, Counterclaim
Plaintiff,

v.

Elementis Chemicals
Inc., Counterclaim
Defendant.

T H Agriculture and Nutrition, L.L.C.,
Counterclaim Plaintiff,

v.

Elementis Chemicals
Inc., Counterclaim
Defendant.

Phillips Electronics North America
Corporation, Third Party
Plaintiff,

v.

Elementis PLC and Elementis
Holdings Ltd., Third Party
Defendants.

T H Agriculture and Nutrition L.L.C.,
Third Party Plaintiff,

v.

Elementis PLC and Elementis
Holdings Ltd., Third Party
Defendants.

No. 03 Civ. 5150(LBS).

United States District Court,
S.D. New York.

Jan. 31, 2005.

Weil, Gotshal & Manges, L.L.P., Konrad L. Cailteux, New York City, for Plaintiff and Third Party Defendants.

Weil, Gotshal & Manges, L.L.P., David R. Berz, David B. Hird, Kristin King Brown, Daniel W. Hurson, Washington, DC, for Plaintiff and Third Party Defendants.

Elementis America, Inc., as counsel for Elementis Chemicals Inc., John Stevens Barnett, Hightstown, NJ, for Plaintiff and Third Party Defendants.

Spencer Fane Britt & Browne LLP, James T. Price, Michael D. Hockley, Kansas City, MO, for Defendant / Third Party Plaintiff T H Agriculture and Nutrition, L.L.C.

Schnader Harrison Segal & Lewis LLP, Peter C. Langenus, Richard J. Pelliccio, New York City, for Defendant / Third Party Plaintiff T H Agriculture and Nutrition, L.L.C.

Mayer, Brown, Rowe & Maw LLP, John C. Berghoff, Jr., Michael P. Rissman, Chicago, IL, for Defendant / Third Party Plaintiff Phillips Electronics North America Corporation.

Mayer, Brown, Rowe & Maw LLP, Thomas M. Mueller, Stefan W. Engelhardt, New York City, for Defendant / Third Party Plaintiff Phillips Electronics North America Corporation.

## OPINION AND ORDER

SAND, District Judge.

In the instant action, plaintiff Elementis Chemicals, Inc. ("Plaintiff" or "ECI") brings suit under the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA"), and under various state-law theories, against defendants T H Agriculture and Nutrition L.L.C. ("THAN") and Phillips Electronics North America Corporation ("PENAC") (collectively referred to as "Defendants"). The matter is before the Court on the parties' cross-motions for summary judgment. For the reasons stated below, Defendants' motion for summary judgment as to Plaintiff's CERCLA claims is granted, Plaintiff's cross-motion for summary judgment as to those CERCLA claims is denied, and the Court declines to exercise supplemental jurisdiction over the state-law claims that remain.

## I. Background

This case stems from a 1981 sale of various chemical manufacturing and distribution facilities.[1] Included in that sale were fourteen facilities particularly relevant here (the "Facilities"), located in Bessemer, Alabama; Dallas, Texas; Davenport, Iowa; Denver, Colorado; Houston,

---

1. The factual background information in this section is taken from the pleadings or from the parties' statements of undisputed material facts pursuant to Local Rule 56.1, except where otherwise indicated.

Texas; Indianapolis, Indiana; Kansas City, Kansas; New Orleans, Louisiana; Oklahoma City, Oklahoma; Powder Springs, Georgia; San Antonio, Texas; St. Paul, Minnesota; Tampa, Florida, and Wichita, Kansas.[2] The sale was consummated on June 12, 1981 pursuant to an Asset Purchase Agreement ("APA"), dated May 11, 1981, among Harrisons & Crosfield, Ltd., an English company; H & C Acquisition, Inc., a Delaware subsidiary of Harrisons & Crosfield, Ltd., North American Phillips Corporation ("NAP"); and Thompson–Hayward Chemical Company, a then-wholly-owned subsidiary of NAP.[3] The parties refer to Thompson–Hayward Chemical Company in its pre–May–1981 form as "Old Thompson–Hayward."

Pursuant to the APA, H & C Acquisition purchased, from NAP and Old Thompson–Hayward, the assets that made up the Industrial Chemical Division, Textile Maintenance Division, and Pest Control Operators Division of Old Thompson–Hayward. H & C Acquisition later changed its name to Thompson–Hayward (referred to as "New Thompson–Hayward"), then changed its name to Harcros Chemicals, Inc., and eventually became Elementis Chemicals, Inc., the plaintiff in this action. NAP later became PENAC, one of the defendants in this action. Old Thompson–Hayward subsequently became THAN, the other defendant in this action. THAN is a Delaware limited liability company, the principal member of which is PENAC.

Various chemicals that constitute "hazardous substances" under CERCLA, see 42 U.S.C. § 9601(14), were used by Old Thompson–Hayward at some or all of the facilities ultimately acquired by ECI. In its complaint in the instant action, filed in July of 2003, ECI alleges that it has incurred costs in response to contamination resulting from Old Thompson–Hayward's activities with respect to those chemicals, and that pursuant to CERCLA it has a right to recover those costs from THAN as to all fourteen Facilities and from PENAC as to the New Orleans facility. ECI also alleges that Defendants have breached certain indemnification provisions of the APA regarding preexisting environmental liabilities, as a remedy for which ECI requests both damages and a declaration of its contract rights. ECI further alleges that it is entitled to recovery from THAN under the Indiana Environmental Legal Action statute ("Indiana ELA"), Indiana Code § 13–30–9–2, for costs it has incurred to remedy contamination at the Indianapolis facility that occurred when THAN's predecessor owned that facility.

2. There is some dispute regarding how many additional facilities, in how many other locations, were sold. At the pleading stage, there was also a dispute regarding the status of the Powder Springs facility, which ECI's Complaint alleged was "[l]eased." (Compl. ¶ 20.) In ECI's response to one of Defendants' Rule 56.1 statements, however, it "agrees that by [the 1981 purchase agreement], Elementis [Chemicals, Inc.] acquired ownership of the Bessemer, Dallas, Davenport, Denver, Houston, Indianapolis, Kansas City, New Orleans, Oklahoma City, Powder Springs, San Antonio, St. Paul, Tampa, and Wichita Facilities." (Pl. Opp. to Defs. 56.1 Stmt in Support of Defs. Motion for Partial Summary Judgment as to Counts I and II and for Dismissal of the Remaining State–Law Claims, at ¶ 1.)

3. In Plaintiff's Rule 56.1 statement, Plaintiff states that defendant PENAC and "Harrison & Crossfield, Ltd." were signatories to the APA, and Defendants agree. (Pl. 56.1 Stmt ¶ 7; Def. Resp. to Pl. 56.1 Stmt ¶ 7.) The copy of the APA attached as exhibit 1 to the Declaration of David B. Hird, however, shows NAP to have been a signatory rather than PENAC, and shows "Harrisons & Crosfield, Ltd." to be spelled differently than in the Rule 56.1 statement. Since the parties agree that at some point in time NAP simply "changed its name" to PENAC (Pl. 56.1 Stmt ¶ 1; Def. Resp. to Pl. 56.1 Stmt ¶ 1), and clearly appear to be referring to the same other party to the APA whether it be named Harrison & Crossfield or Harrisons & Crosfield, these discrepancies are not material.

Finally, ECI alleges that it is entitled to an allocation of costs pursuant to a settlement agreement it reached with THAN and PENAC regarding allocation of payments made to the City of Wichita under a separate agreement settling the possible CERCLA claims of that City.

THAN and PENAC counterclaim against ECI, each asserting the same four counterclaims. In addition to a counterclaim under CERCLA, THAN and PENAC assert that ECI is liable to them under common-law theories of quantum meruit, unjust enrichment, and contribution; that ECI is liable to them under a Davenport Interim Agreement (officially titled "Interim Cost Sharing Agreement, Davenport, Iowa Facility") entered into in December 1998 by PENAC, THAN, Elementis plc, and Harcros Chemicals, Inc. (now ECI); and that ECI is liable to them under a "Kansas City final allocation agreement" (officially titled "Former Process Building Final Allocation Agreement, 5200 Speaker Road") entered into by PENAC, THAN, Elementis plc, and Harcros Chemicals, Inc. (now ECI).

THAN and PENAC have also brought third-party complaints against Elementis Holdings, Ltd. ("LTD") and Elementis plc ("PLC"). To understand these third-party complaints, it is helpful to note the various names under which those entities were previously known, and the relationship in which they stand to the Plaintiff in the main action. LTD has formerly been known as Harrisons & Crosfield Ltd., Harrisons & Crosfield plc, Elementis plc, and, it asserts, Elementis Holdings plc. PLC is alleged to be a successor to Harrisons & Crosfield plc, and acknowledges that it is "the ultimate corporate parent of . . . ECI" (PLC Ans. to THAN Compl. ¶ 4). According to Plaintiff's Rule 7.1(a) disclosure statement, ECI is wholly owned by Elementis America Inc., a Delaware corporation, which in turn is wholly owned by LTD, which in turn is wholly owned by Elementis Group BV, a Dutch company, which in turn is a wholly owned subsidiary of PLC.

The third-party complaints by THAN and PENAC assert claims under the same common-law theories and contracts based upon which THAN and PENAC counterclaim against ECI—that is, quantum meruit, unjust enrichment, and contribution, the Davenport Interim Agreement and the Kansas City final allocation agreement—as well as under four other contracts. THAN and PENAC bring contract claims against LTD and PLC based upon two interim agreements allegedly entered into in 1987 and 1988 among Harrisons & Crosfield, Ltd., Thompson–Hayward Chemical Company (now ECI), NAP (now PENAC), and T H Agriculture & Nutrition Company, Inc. (described in the third-party complaints as the predecessor to THAN), relating to the New Orleans facility: the 1988 agreement allegedly "provides in part that Elementis Holdings Ltd., Elementis plc, and ECI shall reimburse THAN and PENAC within ten days of receipt of invoices" for certain costs (THAN 3P Compl. ¶ 30; PENAC 3P Compl. ¶ 30). THAN and PENAC also bring contract claims against LTD and PLC based upon a 1993 Indianapolis Interim Agreement among Harcros Chemicals Inc. (now ECI), NAP (now PENAC), and T H Agriculture and Nutrition Company, Inc. (allegedly predecessor to THAN), asserting entitlement to damages and a declaratory judgment. Finally, THAN and PENAC bring contract claims against LTD based upon a November 2000 Wichita Interim Agreement (officially titled the "Interim Cost Sharing Agreement, Wichita Facility") entered into among THAN, PENAC, Elementis Holdings, Ltd., and Harcros Chemicals, Inc. (now ECI)—the same settlement agreement based upon which ECI pursues one of its initial claims.

Third-party defendants LTD and PLC, in turn, counterclaim against defendant/third-party-plaintiff THAN, although not against PENAC. They assert that THAN is liable to them under CERCLA for costs incurred in responding to contamination that had been present at the Facilities prior to the closing of the APA.

Taking full advantage of the permission granted by Rule 56 of the Federal Rules of Civil Procedure to seek summary judgment as to "a claim, counterclaim, or cross-claim ... or any part thereof," Fed. R. Civ. Pro. 56(a)-(b), the parties in the underlying action have now filed six distinct motions for summary judgment. The first pair of cross-motions for summary judgment (discussed in Part III *infra*) deals generally with the extent of Defendants' liability, if any, under CERCLA and Indiana environmental law. The second pair of cross-motions concerns the Defendants' alleged contractual liability. Defendants have also filed one motion for summary judgment regarding issues specific to the Davenport and Indianapolis sites, and another regarding issues specific to the Kansas City facility; these motions address not only the question of Defendants' liability, but also Defendants' counterclaims. The first pair of summary judgment motions will be addressed first, because a victory for Defendants on those motions could (and ultimately does) lead to this Court deciding not to exercise supplemental jurisdiction over the remaining state-law claims.

## II. Standard for Summary Judgment

The standard governing motions for summary judgment is "well established" in the Second Circuit. *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir.2003).

> Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.
>
> In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.] Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party.

*Marvel Characters v. Simon*, 310 F.3d 280, 285–86 (2002) (*quoted in Ford*, 316 F.3d at 354) (internal citations and quotations omitted).

The standard for summary judgment is thus relatively favorable to the nonmovant: the movant must show that no remaining issue of material fact would be present under any reasonable view of the evidence in the record. For a disputed fact to be material, however, the non-moving party must not be in the position of having "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," because "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Also, while the burden of establishing an absence of dispute over any material fact is initially on the movant,

> [o]nce the movant has established a *prima facie* case demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will

not be defeated merely upon a "metaphysical" doubt concerning the facts, or on the basis of conjecture or surmise. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991) (internal citation omitted). That is, if despite "[v]iewing the evidence produced in the light most favorable to the nonmovant … a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991).

### III. Plaintiff's and Defendants' Cross–Motions for Partial Summary Judgment With Respect to CERC-LA Liability

Plaintiff ECI has moved for summary judgment on the first and fifth causes of action in its Complaint with respect to the Kansas City, Indianapolis, New Orleans and Davenport facilities—that is, ECI's claims that THAN is liable under CERC-LA for "necessary response costs [ECI] incurred consistent with the National Contingency Plan" (Compl.¶¶ 35–37) to redress contamination at those facilities that predated the APA, and that THAN is also liable under the Indiana ELA for the "costs of removal and remedial actions" (Compl.¶¶ 58–60) that ECI incurred at the Indianapolis facility because of pre-APA contamination.[4] (Pl. Notice of Motion for Partial Summary Judgment on the First and Fifth Claims Stated in Its Complaint ["Pl. CERCLA MSJ"], at 1.) Defendants have moved for partial summary judgment dismissing the first and second causes of action in ECI's Complaint—that is, ECI's claims that THAN is liable under CERC-LA for "necessary response costs [ECI]

incurred consistent with the National Contingency Plan at each of the Facilities" (Compl.¶¶ 35–37) and that PENAC is similarly liable for response costs incurred by ECI at the New Orleans facility. Defendants have also moved for dismissal of the state-law claims made by ECI that would remain if the Court were to grant summary judgment and dismiss ECI's CERC-LA causes of action as they request.

### A. Private Rights of Action Under CERCLA

There are two sections of CERCLA that grant a private right of action for recovery of certain cleanup costs: section 107(a), 42 U.S.C. § 9607(a), and section 113(f), 42 U.S.C. § 9613(f). ECI has brought its suit under both sections, pleading in the alternative, as it is permitted to do under Rule 8(e)(2) of the Federal Rules of Civil Procedure.

### 1. Section 107(a)

■ Section 107(a) of CERCLA states that "[n]otwithstanding any other provision or rule of law, and subject only to the defenses set forth in [§ 107](b)," certain classes of persons "shall be liable for," among other things, "necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C.S. § 9607(a) (2004). In the Second Circuit,

> a finding of liability under § 107(a) requires proof that:
>
> (1) the defendant is within one of the four categories of responsible parties enumerated in § [1]07(a); (2) the … site is a facility as defined in [42

---

**4.** In its Notice of Motion, ECI describes the first and fifth causes of action in its Complaint, on which it is moving for summary judgment, as involving "the statutory liability of [THAN] to plaintiff … for all Preexisting Contamination in the environment of" the

facilities at issue. The term Preexisting Contamination is defined in ECI's Rule 56.1 Statement as "environmental liabilities relating to time periods or events occurring prior to June 12, 1981." (Pl. 56.1 Stmt. ¶ 21.)

U.S.C.] § 9601(9); (3) there is a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or threatened release; and (5) the costs and response actions conform to the national contingency plan. *Goodrich Corp. v. Town of Middlebury,* 311 F.3d 154, 168 (2002) (quoting *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 514 (1996)). The classes of parties enumerated in § 107(a) are:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance[.]

42 U.S.C.S. § 9607(a) (2004). Although "[t]he phrase 'from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance' is incorporated in and seems to flow as if it were a part only of subparagraph (4), it ... also modifies subparagraphs (1)-(3) inclusive," its placement at the end of subparagraph (4) apparently having been "simply a printer's error."

*New York v. Shore Realty Corp.,* 759 F.2d 1032, 1043 n. 16 (2d Cir.1985).

■ In determining liability under § 107(a), the "quantity and concentration" of a hazardous substance that has been disposed of or otherwise released "is not a factor," *United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 720 (2d Cir.1993), and "[i]t is not a defense that the particular hazardous substance attributable to a specific defendant is not linked to the plaintiff's response costs," *Prisco v. A & D Carting Corp.,* 168 F.3d 593, 603 (2d Cir. 1999). Once a defendant is established to be within a § 107(a) category and the other four requirements are met, the only exception to CERCLA's strict-liability rule is the affirmative defense laid out in section 107(b). *See Bedford Affiliates v. Sills,* 156 F.3d 416, 425 (2d Cir.1998); *Shore Realty Corp.,* 759 F.2d at 1044.

The criteria for entitlement to a § 107(b) affirmative defense are quite stringent. The defendant must:

establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—

(1) an act of God;

(2) an act of war;

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of

all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or

(4) any combination of the foregoing paragraphs.

42 U.S.C.S. § 9607(b) (2004). In essence, an affirmative defense under § 107(b) requires the defendant to establish that neither he nor anyone with whom he had a significant contractual or agency relationship had anything to do with causing the release of hazardous substances in question.

## 2. Section 113(f)

Section 113(f) of CERCLA provides two mechanisms by which a private party may seek contribution with regard to its CERCLA liability. Although Plaintiff only cited to one of the two mechanisms in its complaint, it is appropriate to examine both, because both are addressed in the parties' briefs and "[t]he failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim." *Albert v. Carovano*, 851 F.2d 561, 571 n. 2 (2d Cir.1988).

First, under § 113(f)(1), "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 107(a), during or following any civil action under section 106 or under section 107(a)." 42 U.S.C.S. § 9613(f)(1). Section 106 of CERCLA allows abatement actions by the federal government. *See* 42 U.S.C.S. § 9606 (2004). Thus, § 113(f)(1) allows a person who has been subject to either a private cost-recovery action or a federal abatement action under CERCLA to seek contribution. *See Cooper Industries v. Aviall Services*, —— U.S. ——, ——, 125 S.Ct. 577, 583, 160 L.Ed.2d 548 (2004). The Second Circuit has held that as a substantive matter, "[t]he elements of an action under § 113(f)(1) are the same as those under § 107(a)." *Bedford Affiliates*, 156 F.3d at 427.

Second, under § 113(f)(3)(B), "[a] person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in [§ 113(f) ](2)." 42 U.S.C.S. § 9613(f)(3)(B) (2004). CERCLA section 113(f)(2) states in relevant part that "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C.S. § 9613(f)(2) (2004). Thus, § 113(f)(3)(B) says in essence that any person who has settled with the United States or a State regarding its CERCLA liability may seek contribution from any other person who has not so settled, but may not seek contribution from those who have settled.

## B. Recovery by a Responsible Party That Has Not Been Sued and Has Not Settled

The legal question presented by this pair of cross-motions for summary judgment is whether a party that concededly bears some legal responsibility under CERCLA for contamination at particular sites (here ECI) may, under either § 107(a) or § 113(f), seek to recover response costs from other parties that bear some responsibility for contamination at those same sites, if the first party (ECI) has not been the subject of a previous civil action under CERCLA § 106 or § 107(a), and has not entered into a settlement of its CERCLA liability with the federal government or a state government. ECI moves for summary judgment contending that despite those circumstances, THAN is liable

to ECI under CERCLA for an as-yet-undetermined amount of response costs. THAN and PENAC move for summary judgment contending that under those circumstances, they are not liable to ECI under CERCLA for any response costs.

### 1. Section 113(f)

■ Following the Supreme Court's recent decision in *Cooper Industries v. Aviall Services,* — U.S. ——, 125 S.Ct. 577, 160 L.Ed.2d 548 (2004), the parties agree that no claim under section 113(f) is available to ECI.[5] ECI acknowledges that in the wake of *Cooper Industries* it "may not bring an action under section 113(f)(1) of CERCLA at the present time with respect to any of the sites at issue in this case." (Plaintiff's Supplemental Memorandum With Respect to Outstanding Summary Judgment Motions ["Pl. Supp. Mem."] at 5.) The Court in *Cooper Industries* held that contribution under § 113(f)(1) "may only be sought . . . 'during or following' a . . . civil action" brought under § 106 or § 107, notwithstanding the "saving clause" at the end of § 113(f)(1) stating that "[n]othing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title," — U.S. at ——, 125 S.Ct. at 583 (quoting 42 U.S.C. § 9613(f)(1). Not having been previously sued under section 106 or 107 of CERCLA, ECI is precluded by *Cooper Industries* from seeking recovery under § 113(f)(1), as it properly concedes. ECI also acknowledges that it may not "bring a contribution action under [CERC-LA] section 113(f)(3)(B) because it has not entered into a CERCLA settlement with the federal [government] or a state government," the precondition for a contribution action under that section.[6] (Pl. Supp. Mem. at 5.) Thus, it is clear that any successful CERCLA claim by ECI regarding the sites at issue in this case would have to be pursuant to § 107(a).

### 2. Section 107(a)

■ The problem ECI faces in making a § 107(a) claim is that existing Second Circuit precedent appears to preclude a party who is potentially responsible under CERCLA with respect to a particular site (a "Potentially Responsible Party" or "PRP"), and who lacks a § 107(b) affirmative defense with respect to that site, from proceeding under § 107(a) with respect to that site. In *Bedford Affiliates v. Sills,* 156 F.3d 416 (2d Cir.1998), the Court of Appeals for the Second Circuit found the structure of the CERCLA statute to imply that section 107(a) was a more generous remedy for the completely innocent, while section 113(f)(1) was a stingier remedy for those who were themselves partially responsible for the environmental damage that caused them to incur costs:

> The language of CERCLA suggests Congress planned that an innocent party be able to sue for full recovery of its costs, i.e., indemnity under § 107(a), while a party that is itself liable may recover only those costs exceeding its pro rata share of the entire cleanup expenditure, i.e., contribution under § 113(f)(1).

---

**5.** After the Supreme Court's decision in *Cooper Industries,* the Court directed the parties to file supplemental briefs addressing the impact of that decision on the pending cross-motions for partial summary judgment, including Defendants' motion also requesting dismissal of the remaining state-law claims.

**6.** ECI notes one settlement into which it did enter with respect to a site in Wichita, Kansas, but acknowledges that this settlement does not create the possibility of a § 113(f)(3)(B) contribution action because the terms of the settlement itself protect ECI and THAN from § 113(f) actions.

156 F.3d at 424. Because § 107(a) has a longer six-year statute of limitations compared to the three-year limitation of § 113(f)(1), as well as allowing for more generous recovery, a PRP given the choice between § 113(f)(1) and § 107(a) would always proceed under § 107(a), rendering § 113(f)(1) superfluous; the Second Circuit "decline[d] to interpret § 107(a) so broadly that § 113(f)(1) would become a nullity." 113 F.3d at 424. Therefore, the Second Circuit held that "a potentially responsible person under § 107(a) that is not entitled to any of the defenses enumerated under § 107(b) ... cannot maintain a § 107(a) action against another potentially responsible person." 113 F.3d at 425. Rather, under *Bedford Affiliates,* such a PRP "must rely on a claim for contribution provided for in CERCLA § 113(f)(1)." *Id.*

Thus, for Plaintiff's § 107(a) claim to survive summary judgment, either there would have to be a genuine issue of material fact regarding whether Plaintiff is a PRP lacking § 107(b) affirmative defenses, or the holding of *Bedford Affiliates* would have to no longer bind this Court. Plaintiff previously argued briefly in one footnote that Defendants had not introduced any evidence showing it to be a PRP at sites other than Kansas City and Davenport (Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment as to Counts I and II[and]

For Dismissal of the Remaining State–Law Claims ["Pl. CERCLA Opp. Mem."] at 12 n. 7), but appears to have abandoned that argument, referring in its latest submission to "a PRP such as ECI" that it contends "may sue another PRP to recover a portion of the response costs it incurred" (Pl. Supp. Mem. at 10).

Defendants' basis for labeling Plaintiff a PRP with respect to all the Facilities at issue in this case is the argument that Plaintiff must have incurred the "necessary costs of response"[7] for which it sues while it was the owner and operator of the Facilities in question.[8] (Plaintiff still owns the Indianapolis, New Orleans, and San Antonio facilities; it sold the other Facilities to Harcros Chemicals, Inc. in 2001.) Among the elements of a § 107(a) claim are that "there is a release or threatened release of hazardous substances at the facility [in question]" and that "the plaintiff incurred costs responding to the release or threatened release." *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 514 (2d Cir.1996), *quoted in Goodrich Corp. v. Town of Middlebury,* 311 F.3d 154, 168 (2d Cir.2002), *and overruled on other grounds in New York v. Natl. Services Indus.,* 352 F.3d 682, 684 (2d Cir.2003). Thus, to the extent that the costs for which Plaintiff sues are recoverable in a § 107(a) action, they would have to have been incurred responding to a release or threat of release.

**7.** Defendants quote here from 42 U.S.C. § 9607(a) (2004), which allows recovery of "necessary costs of response incurred by any other person consistent with the national contingency plan." (Memorandum in Support of Defendants' Motion for Partial Summary Judgment as to Counts I and II and for Dismissal of the Remaining State–Law Claims ["Def. CERCLA Mem."] at 7.)

**8.** Although Defendants use the statutory phrase "owner and operator" (Def. CERCLA Mem. at 7), Second Circuit case law appears to indicate that being a present owner *or* operator is sufficient for § 107(a) liability;

both owning *and* operating a facility is not necessary. *See, e.g., New York v. Natl. Servs. Indus.,* 352 F.3d 682, 684 (2d Cir.2003) ("CERCLA makes any 'person' who is the past or present owner of a contaminated facility ... liable for the cost of cleaning up the facility"); *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1198 (2d Cir.1992) (including "past and present owners or operators of facilities" among the "four classes of responsible parties" under CERCLA). Since neither party contends that ECI did not operate the facilities that it owned, this distinction is not material.

"[S]ection [1]07(a)(1) unequivocally imposes strict liability on the current owner of a facility from which there is a release or threat of release, without regard to causation." *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1044 (2d Cir.1985). In *Bedford Affiliates,* the Court of Appeals held that such a facility owner was a PRP under § 107(a)(1), and was thus disqualified from pursuing a § 107(a) claim in the absence of any § 107(b) affirmative defense, regardless of whether or not it had "contribute[d] actively to the contamination" at issue. 156 F.3d at 425. Logically, the same release or threat of release that made ECI's costs as an owner and operator recoverable under § 107(a) also rendered ECI a PRP subject to the *Bedford Affiliates* rule.

■ This argument implicitly relies on the assumption that a party's status as an "owner and operator" under CERCLA § 107(a) is determined at the time of the cleanup for which cost recovery is sought. There is some authority to support such a reading of § 107(a), although the issue has rarely, if ever, been squarely addressed and the cases are not unanimous. *AM Int'l, Inc. v. International Forging Equip. Corp.,* 982 F.2d 989, 997 (6th Cir.1993) ("Section 107(a) defines the following as liable parties: (1) owners and operators of a facility at the time of its cleanup"); Alfred R. Light, *CERCLA Law and Procedure* 112 (1991) ("[Section 107(a)(1)] is interpreted to bring within the class of potentially liable persons any owner or operator of the ... facility at the time of the cleanup"); *see also Me. Yankee Atomic Power Co. v. United States,* 271 F.3d 1357, 1366 (Fed.Cir.2001) ("Such responsible persons include those involved in the cleanup work, including 'the owner and operator' of ... a facility' "); *Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837, 845 (4th Cir.1992) (noting that requiring active participation in waste disposal as a precondition for CERCLA own-ership liability would mean that "an owner could insulate himself from liability by ... his passivity, so long as he transfers the property before any response costs are incurred ... [while] [a] more conscientious owner who undertakes the task of cleaning up the environmental hazard would ... be liable as the current owner of the facility."); *City of Bangor v. Citizens Communs. Co.,* Civil No. 02–183–B–S, 2004 WL 483201, at *7, 2004 U.S. Dist. LEXIS 3845, at *32 (D.Me. Mar. 11, 2004) ("there appears to be incorporated into 107(a)(1)'s concept of facility ownership an understanding that ownership pertains to the facility where response costs are being expended"). *Contra United States v. Fleet Factors Corp.,* 901 F.2d 1550, 1554 (11th Cir.1990) ("we will construe the present owner and operator of a facility as that individual or entity owning or operating the facility at the time the plaintiff initiated the lawsuit by filing a complaint"), *superseded on other grounds as stated in Monarch Tile, Inc. v. City of Florence,* 212 F.3d 1219, 1221 n. 2 (11th Cir.2000). The Court finds the interpretation of § 107(a) that is implied by Defendants' argument to be persuasive.

If ECI had filed suit to recover its cleanup costs at the time they were incurred, when it was still the owner of the facilities in question, it would clearly have been a PRP, and thus subject to the rule of *Bedford Affiliates* that in the absence of a § 107(b) affirmative defense it could not bring a § 107(a) action. It would be quite odd if ECI could regain an otherwise unavailable cause of action, to recover costs that it had already incurred, simply by selling certain facilities after the fact (and selling them to a possibly related party known by a name that formerly referred to ECI, at that). The more logical interpretation would seem to be that a party's status as a present owner and operator is determined at the time a claim accrues,

when there is a release or threat of release and costs are incurred. This interpretation also involves a more natural reading of the text of § 107(a): that section refers to "the owner and operator of a . . . facility . . . from which there is a release, or a threatened release which causes the incurrence of response costs," 42 U.S.C.S. § 9607(a) (2004), not to the owner and operator of a facility at which there *was* an incurrence of response costs for which a suit has since been filed.

Perhaps recognizing this, ECI does not assert a contrary interpretation of CERCLA § 107(a)(1). ECI also does not dispute its designation as a PRP under this interpretation of § 107(a)(1), or contend that it qualifies for an affirmative defense under § 107(b), so as to escape the prohibition of *Bedford Affiliates*. Rather, ECI argues that *Bedford Affiliates* is no longer binding law.

ECI argues, first, that because "one of the essential underlying premises on which cases like *Bedford Affiliates* were based [was] that all PRPs, including those who had not been subject to a prior 106 or 107(a) action, such as the plaintiff in *Bedford Affiliates,* can proceed with a contribution action under section 113(f)," *Cooper Industries* "calls into question" decisions like *Bedford Affiliates.* (Pl. Supp. Mem. at 6–7.) "The question . . . whether a PRP who has cleaned up a site without first being sued or settling with the government has any right to sue another PRP under CERCLA" has been "reopened by the *Cooper Industries* decision," ECI contends, and "it is incongruous to read *Bedford Affiliates* as answering that question in the negative" given that *Bedford Affiliates* allowed such a PRP to sue other PRPs and recover 95% of its costs. (Pl. Supp. Mem. at 7.) In addition, ECI argues, the *Cooper Industries* Court, by stating that the saving clause of § 113(f)(1) "rebuts any presumption that the express

right of contribution provided by the enabling clause [of section 113(f)(1) ] is the exclusive cause of action for contribution available to a PRP," — U.S. at ——, 125 S.Ct. at 584, rendered "inappropriate" the line of reasoning followed by the Second Circuit in *Bedford Affiliates* regarding what had to be done "in order to give meaning to Congress's adoption of section 113(f)(1)." (Pl. Supp. Mem. at 11–12.) Therefore, ECI asserts that *"Cooper Industries . . . effectively overrules Bedford Affiliates."* (Pl. Supp. Mem. at 11.)

The problem with this assertion is that the Supreme Court in *Cooper Industries* explicitly "withh[e]ld judgment" regarding the correctness of *Bedford Affiliates* and other "decisions of the Courts of Appeals . . . holding that a private party that is itself a PRP may not pursue a § 107(a) action against other PRPs for joint and several liability." — U.S. at ——, 125 S.Ct. at 585 (citing, *e.g., Bedford Affiliates,* 156 F.3d at 423–24; *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.,* 153 F.3d 344, 349–56 (6th Cir.1998); *Pinal Creek Group v. Newmont Mining Corp.,* 118 F.3d 1298, 1301–06 (9th Cir.1997)). The *Cooper Industries* Court also "withh[e]ld judgment" regarding whether a PRP such as Aviall "may pursue a § 107 cost recovery action for some of liability other than joint and several", — U.S. at ——, 125 S.Ct. at 585, and "decline[d] to decide" whether a PRP such as Aviall "has an implied right of contribution under § 107," — U.S. at ——, 125 S.Ct. at 586. It would be inappropriate for this Court to contradict the Supreme Court and declare that the Supreme Court had effectively done something which it specifically said it had not done—namely, overruled *Bedford Affiliates.*

Plaintiff cites *United States v. Emmenegger,* 329 F.Supp.2d 416, 429 (S.D.N.Y. 2004), for the proposition that "a district

court in this circuit is not bound to follow precedent where 'a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit'" (Pl. Supp. Mem at 2), and suggests that under that rule this Court need not follow *Bedford Affiliates.* The context in which *Emmenegger* arose and the full language of the *Emmenegger* decision, however, tend to support not the conclusion that this Court may freely ignore *Bedford Affiliates,* but rather the conclusion that this Court must follow the precedent of *Bedford Affiliates.*

■ The question before the district court in *Emmenegger* was whether the United States Sentencing Guidelines could be applied to the defendant in that case consistently with the Supreme Court's decision in *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), which had struck down a system of sentence determination through judicial factfinding, seemingly similar to the Sentencing Guidelines, on the ground that it violated the Sixth Amendment right to a jury trial. In considering this question, the *Emmenegger* court was "keenly aware of the presence of binding circuit authority," noting that "Blakely itself is simply an elaboration of the principle set forth in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) [and] the Second Circuit has already held that *Apprendi* does not render the Guidelines unconstitutional." 329 F.Supp.2d at 429 (citing *United States v. Luciano,* 311 F.3d 146 (2d Cir.2002).) The *Emmenegger* court stated that under those circumstances "[t]he precise question for th[e] [District] Court ... is not whether, by its own analysis, *Blakely's* reasoning supports a finding that the Guidelines are unconstitutional; it is whether *Blakely* so conclusively supports that finding that the Second Circuit or the Supreme Court is all but certain to overrule *Luciano.*"

The *Emmenegger* court answered that latter question in the negative and decided to follow the Sentencing Guidelines, in large part because the Supreme Court in *Blakely* had "expressly reserved the question of the consistency of the Guidelines with *Apprendi,*" 329 F.Supp.2d at 429 (citing 124 S.Ct. at 2538 n. 9). A panel of the Second Circuit later reached the same conclusion regarding the post-*Blakely* applicability of the Sentencing Guidelines, for similar reasons. *United States v. Mincey,* 380 F.3d 102, 106 (2d Cir.2004) (refusing to "abandon the prevailing law of this Circuit because of arguments based on what the Blakely decision might portend for the future of Guidelines sentencing" in part because "the Supreme Court explicitly stated in Blakely that '[t]he Federal Guidelines are not before us, and we express no opinion on them.'") (quoting *Blakely,* 542 U.S. at ——, 124 S.Ct. at 2538). This Court reads *Emmenegger* and *Mincey* to suggest that in the Second Circuit, the Supreme Court will not be held to have implicitly expressed an opinion on a question which it explicitly declines to address, so as to overrule Circuit precedent—even if the Supreme Court's future expression of that opinion is viewed by some as quite likely, as the Supreme Court's recent invalidation of the Sentencing Guidelines in *United States v. Booker* and *United States v. Fanfan,* —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), was expected by some after *Blakely.*

This reading of *Emmenegger* and *Mincey* is supported by *Meacham v. Knolls Atomic Power Laboratory,* 381 F.3d 56 (2d Cir.2004), cited by Defendants in their supplemental brief. (Defendants' Brief Regarding the Effect of the Supreme Court's Decision in *Aviall* ["Def. Supp. Brf."] at 4–5.) In *Meacham,* a panel of the Second Circuit determined that it was required to follow the Circuit's prior holdings allowing disparate impact claims under the Age

Discrimination in Employment Act (ADEA), precedent which it could ignore "only if a Supreme Court decision or a decision from this circuit sitting en banc implicitly or explicitly overrules it." 381 F.3d at 70–71. The defendant in *Meacham* argued that previous Second Circuit precedent on the subject had been called into question by the Supreme Court's holding in *Hazen Paper v. Biggins*, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), that "an employer may lawfully discriminate based on factors closely correlated with age," *Meacham*, 381 F.3d at 70, and by dicta in the *Hazen Paper* opinion, both of which the defendant contended "suggest[ed] that the Supreme Court ultimately will reject ADEA disparate impact claims," *id.* The *Meacham* panel rejected this argument because "the Hazen Paper Court directly stated that it had not resolved the viability of ADEA disparate impact claims . . . [and] [t]he Supreme Court's express statement contradicts any claim that Hazen Paper expressly or implicitly overruled our prior precedent." *Id.* (citing *Hazen Paper*, 507 U.S. at 610, 113 S.Ct. 1701). Here, the Supreme Court's express statement in *Cooper Industries* contradicts any claim that *Cooper Industries* expressly or implicitly overruled *Bedford Affiliates.*

Without assuming that the Supreme Court has already overruled *Bedford Affiliates,* an assumption that would be inconsistent with the reasoning of *Meacham, Mincey,* and *Emmenegger,* this Court cannot say with confidence that *Bedford Affiliates* "will almost inevitably be overruled by the Second Circuit," *Emmenegger,* 329 F.Supp.2d at 429. There are at least two reasons why the Second Circuit, even if it were to reconsider the appropriateness of the *Bedford Affiliates* rule in light of *Cooper Industries,* might well decide to leave that rule in place.

First, the concern expressed in *Bedford Affiliates* regarding the apparent superfluousness of § 113(f)(1) if § 107(a) is held available to PRPs could plausibly survive the holding of *Cooper Industries.* Why would a PRP who had been sued, and who thus was not barred by *Cooper Industries* from utilizing § 113(f)(1), choose to proceed under the stingier § 113(f)(1) rather than the more generous § 107(a) if both were available? Perhaps the Court of Appeals will hold, as Plaintiff suggests, that *Cooper Industries* implicitly ruled out this sort of logic even as it explicitly declined to overrule *Bedford Affiliates;* perhaps not. Perhaps the Court of Appeals will hold that PRPs who have not been sued may proceed under the more generous § 107(a), but PRPs who have been sued must be content with the stingier § 113(f)(1); perhaps it will hold instead that all PRPs are restricted to the stingier § 113(f) even if one of the aspects of that stinginess is the existence of additional preconditions for recovery. The question of precisely how § 113(f) and § 107(a) were meant to coexist—the question that motivated the holding in *Bedford Affiliates*—is still an important and difficult one. *See Cooper Industries,* —— U.S. at ——, 125 S.Ct. at 585 (observing that "the relationship between §§ 107 and 113 . . . is a significant issue in its own right").

Also, the predicament in which PRPs barred from § 113(f)(1) relief by *Cooper Industries* would find themselves if they continued to be barred from § 107(a) relief by *Bedford Affiliates* could be justified as a matter of policy. There would be one remaining route to CERCLA relief for such PRPs: as the *Cooper Industries* Court noted, CERCLA § 113(f)(3)(B) provides for contribution actions "after an administrative or judicially approved settlement that resolves liability to the United States or a State." —— U.S. at ——, 125 S.Ct. at 584. The Second Circuit observed

in *Bedford Affiliates* that "[i]n enacting § 113(f) ... to aid the expeditious resolution of environmental claims ... Congress employed incentives for responsible parties to settle and strong disincentives for non-settling potentially responsible parties." 156 F.3d at 427 (citing the protection from contribution actions given to settling PRPs by § 113(f)(2) and holding, based on this reasoning, that "CERCLA preempts the state law remedies of restitution and indemnification"). The *Bedford Affiliates* bar on § 107(a) actions by PRPs who do not have a § 107(b) affirmative defense, in conjunction with the *Cooper Industries* bar on § 113(f) actions absent a prior suit or settlement, would operate as such a "strong disincentive[ ] for non-settling potentially responsible parties," 156 F.3d at 427. It would pressure PRPs to settle with some government regarding their own liability for polluting a site, if they wanted to obtain contribution from others also responsible for polluting that site. There is nothing necessarily irrational about requiring a PRP that voluntarily goes to court to obtain cost reimbursement, as opposed to being dragged into court by another party, to either prove its "innocence" (via the assertion of a § 107(b) affirmative defense) or officially admit its "guilt" (via a settlement); such a forced choice would be entirely consistent with Congress's intent as the Second Circuit described it in *Bedford Affiliates*.

Thus, the Court concludes that a future overruling of *Bedford Affiliates* is not inevitable or almost inevitable, so that the holding of *Bedford Affiliates* binds this Court even on the assumption that the exception to the binding power of Circuit precedent noted in *Emmenegger* truly exists. Pursuant to that *Bedford Affiliates* holding, Plaintiff, as a PRP, would have to assert and prove an affirmative defense under CERCLA § 107(b) in order to succeed in an action under CERCLA § 107(a). Plaintiff has not even attempted

to do so, and this "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thus, summary judgment may be granted to Defendants on Plaintiff's CERCLA claim insofar as it is brought under § 107(a).

Since the parties agree that Plaintiff cannot bring an action under CERCLA § 113(f), Plaintiff is left without a valid CERCLA claim under either of its alternative legal theories. The Court will therefore grant summary judgment to Defendants on Plaintiff's CERCLA causes of action.

This result is consistent with the holding of the only other district court in the Second Circuit to address, after *Cooper Industries*, § 107(a) and § 113(f) claims brought by a PRP not previously subject to a CERCLA civil action. In *AMW Materials Testing v. Town of Babylon*, 348 F.Supp.2d 4 (E.D.N.Y.2004), the court granted defendants' motion for summary judgment and dismissed a complaint that "s[ought] recovery under both § [1]07 for indemnification and § [1]13 for contribution." 348 F.Supp.2d at 11. Contribution under § 113 was held barred by *Cooper Industries* because plaintiffs had not been the subject of an appropriate civil action, and indemnification under § 107(a) was held barred by *Bedford Affiliates* and *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 326 (2d Cir.2000), because plaintiffs were responsible parties. 348 F.Supp.2d at 15. The court in *AMW Materials Testing* did not specifically address the issue of whether *Cooper Industries* implicitly overruled *Bedford Affiliates*, perhaps because the issue was not raised by the parties in that case. *AMW Materials Testing* does demonstrate, however, that this Court is not the first to

consider the holding of *Cooper Industries* to be consistent with continued application of the *Bedford Affiliates* bar on § 107(a) actions by responsible parties.

## IV. Supplemental Jurisdiction

■ Plaintiff's CERCLA causes of action are the only federal claims pled in the Complaint, and thus were the sole source of this Court's original federal-question jurisdiction under 28 U.S.C. § 1331. Plaintiff did not invoke diversity jurisdiction under 28 U.S.C. § 1332 and could not have done so, because Plaintiff ECI and defendant PENAC are both Delaware corporations.[9] Supplemental jurisdiction over the state-law claims involved in this action has been invoked pursuant to 28 U.S.C. § 1367.

The supplemental jurisdiction statute provides that a district court "may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C.S. § 1367(c)(3) (2004). Defendants argue that if the underlying federal claims are dismissed on their motion for summary judgment, as has occurred, the remaining state-law claims should be dismissed without prejudice; Plaintiffs argue that supplemental jurisdiction over the state-law claims should be retained. "In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well," *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir.1998), although dismissal of state-law claims under such circumstances is not "absolutely mandatory," *Baylis v. Marriott Corp.*, 843 F.2d 658, 665 (2d Cir. 1988).

Here, the Court would follow the general *Marcus* rule and decline to adjudicate a series of contract disputes between non-diverse parties and a question regarding the proper application of Indiana environmental law. Absent special circumstances not present here, these are not the sorts of matters on which a large amount of federal judicial resources should be expended as a matter of discretion—notwithstanding the fact that the contract disputes relate to a field regulated by the federal government, which after all would not have been sufficient to confer original jurisdiction on this Court in the first instance. Moreover, retaining supplemental jurisdiction over Plaintiff's state-law claims and Defendants' state-law counterclaims would not result in major gains in judicial efficiency. This Court has decided no motions (besides motions for permission to appear pro hac vice) before now, and does not now address the merits of any of the state-law claims, so there will not be a great deal of duplication of judicial effort when a state court addresses the merits of those claims. Thus, if § 1367(c)(3) were applicable, the Court would refrain from exercising jurisdiction over the state-law claims remaining in this case.

In an effort to bring this case within the rule of 28 U.S.C. § 1367(c)(3) and allow that result, Defendants state that their "federal counterclaims are also based on CERCLA Sections 107(a) and 113(f)(1)" and "should receive the same fate as [ECI]'s federal claims." (Def. Supp. Brf. at 2.) Specifically, Defendants note THAN's First Counterclaim and PENAC's First Counterclaim as counterclaims that should be dismissed. (Def. Supp. Brf. at 7.) The Court construes these statements as a motion by Defendants to dismiss their federal counterclaims. Plaintiff would likely not object to this motion, given Plaintiff's statement that "[i]f the Court concludes ... that ECI may not pursue an action under section 107(a) of CERCLA,

---

9. THAN, a Delaware L.L.C. whose principal member is a Delaware corporation (PENAC), would also qualify as a Delaware citizen for purposes of diversity jurisdiction.

then it should dismiss defendants' counterclaims and third-party claims under section 113(f) of CERCLA" (Pl. Supp. Mem. at 17). The Court will therefore grant Defendants' motion to dismiss their CERCLA counterclaims. ECI's third-party claims against Elementis plc ("PLC") and Elementis Holdings Ltd. ("LTD") are not in fact brought under CERCLA, but rather under state-law theories, and thus will not be directly affected by this dismissal.

Third-party defendants PLC and LTD, however, have each asserted a CERCLA counterclaim against defendant/third-party-plaintiff THAN. The status of these third-party federal counterclaims has not been addressed by any of the parties. Defendants have not moved for summary judgment on the third-party federal counterclaims. Plaintiff, who shares counsel with LTD and PLC, has not cited the existence of the third-party federal counterclaims as an argument for the exercise of supplemental jurisdiction. The third-party counterclaimants themselves did not file any response to Defendants' motion that the state-law claims be dismissed if this Court granted summary judgment on ECI's CERCLA claims (despite the fact that they clearly had notice of that motion, it having been served on their counsel). The Court will assume, absent any indication to the contrary, that the third-party counterclaimants would not wish to pursue their counterclaims before this Court given the disposition of the rest of the case, and will therefore dismiss those counterclaims without prejudice subject to an application by either third-party counterclaimant to reinstate its counterclaim.

Having "dismissed all claims over which it has original jurisdiction," 28 U.S.C.S. § 1367(c)(3) (2004), the Court declines to exercise supplemental jurisdiction over the state-law claims, counterclaims and third-party claims that remain.

## V. Conclusion

For the reasons set forth above, Defendants' Motion for Partial Summary Judgment as to Counts I and II and for Dismissal of the Remaining State–Law Claims is GRANTED. Plaintiffs' CERCLA claims, as laid out in Counts I and II of the Complaint, are DISMISSED. Defendants' CERCLA counterclaims are also DISMISSED. The third-party CERCLA counterclaims of Elementis plc and Elementis Holdings, Ltd. are DISMISSED without prejudice, subject to an application by either third-party counterclaimant to reinstate its counterclaims; such application, if made, shall be filed within thirty (30) days of the date of this Opinion and Order. The Court declines to exercise jurisdiction over the remaining claims, counterclaims, and third-party claims arising under state law, all of which are DISMISSED without prejudice.

Plaintiff's Motion for Partial Summary Judgment With Respect to the Liability of Defendant T H Agriculture and Nutrition, L.L.C. Under CERCLA and Indiana Law is accordingly DENIED in part on its merits (as to CERCLA) and DENIED in part as moot (as to Indiana law). Plaintiff's Motion for Partial Summary Judgment With Respect to Contractual Liability, Defendants' Motion for Partial Summary Judgment on Breach of Contract Claim (Count III), Defendants' Motion for Partial Summary Judgment Regarding Davenport and Indianapolis Sites, and Defendants' Motion for Partial Summary Judgment for Closure, Post–Closure and Corrective Action Activities at the Kansas City Facility are DENIED as moot.

SO ORDERED.